603 So.2d 309 (1992)
Larry L. WILKINS
v.
STATE of Mississippi.
No. 89-KA-0266.
Supreme Court of Mississippi.
June 3, 1992.
*310 Robert E. Clark, Vidalia, for appellant.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and SULLIVAN and McRAE, JJ.
HAWKINS, Presiding Justice, for the Court:
Larry L. Wilkins appeals his conviction of murder in the circuit court of the First Judicial District of Panola County and sentence to life imprisonment. Because of the *311 admission of inadmissible hearsay testimony through the guise of "impeaching" a State witness, we reverse and remand. We find no other error.

FACTS
Sue and the late Willie Nesbit "Woody" Garner lived in a double trailer in Longtown, a community in the northwest corner of Panola County.
Garner apparently was Sue's (whose maiden name was Wilkins) third husband. Her marital union to a man named Jimmy Ray Barnes, Sr., produced three children, namely: Jimmy, Jr., Lisa and David, who were grown. A subsequent marriage to a man named Clifton Leroy Dyer produced Glenn Dyer, who in November, 1987, was thirteen years old. She married Garner January 12, 1978. On Tuesday, November 3, 1987, an election day, she was employed at the F.O. James Gas Company in Crenshaw, and went to work at 2:00 p.m. and got off work at ten that night.
Sue Garner's son Glenn was staying at the home of his sister Lisa, who, along with her husband David and baby girl Shelly, was living with his parents, DeLayne and Anna Mayo, in the Sarah community in the extreme Southwest corner of Tate County. Sue was in the Mayo home a few minutes that evening, and then drove to her own residence about five miles distance, arriving with Glenn around eleven o'clock that night.
A glance at the map reveals that Batesville, the county seat of the First Judicial District of Panola County, is 22 miles South of Senatobia in Tate County, and that Senatobia in turn is five miles South of Coldwater. Como is 15 miles North of Batesville, and Longtown is about ten miles due West of Como. Senatobia is approximately twenty miles driving distance from Longtown.
Sue has two brothers, Barry and Larry L. Wilkins. On November 3, 1987, Barry and his wife Katie were living in the Senatobia Trailer Park, also called "City Trailer Park."
As noted, Sue's daughter, Lisa, was married to David Mayo, and on November 3 they were, with their few-months-old baby girl, Shelly, living at the home of his parents.
David Barnes was married to Susan Leigh Barnes, also twenty years of age. They had a few-months-old baby boy, Dustin, and on November 3 she and David were separated. She was living in the same trailer park as Barry Wilkins, but because she had no heat, her mother was keeping the baby.
David Mayo owned a 1979 400 model Honda motorcycle that on November 3 had been loaned to David Barnes. On November 3 Barnes and his uncle, Larry L. Wilkins, were staying in the Sandman Motel in Senatobia.
On October 29 previous, Sue, accompanied by her son, David Barnes, drove to Memphis where her brother Larry Wilkins was staying, and the three returned to the Howard Johnson Motel in Senatobia, where she rented a room for Larry and David. On the next day they checked out and Larry and David moved in for a day or two with her brother Barry. The two then checked into the Sandman Motel November 1.
On the night of November 3, Susan Barnes was driven to the Sandman Motel by a friend, Ronald Kolb, arriving there precisely at 11:00 p.m., as told to do by her brother, David. When she got there Barry and David were in the room, David drinking Old Charter whiskey, and Barry drinking Busch brand beer. Larry was not there, and the motorcycle that David had borrowed was gone.
Barry remained a few minutes and left. Susan remained another hour or hour and a half, as she estimated  she had no watch  arguing over their baby, Dustin. Susan then left the motel and walked to the trailer park about a mile away, arriving  again according to her estimation  around 1:00 a.m.
About two hours later David rode to her trailer on his motorcycle and they talked about fifteen minutes. David then rode off.
*312 Susan wanted to talk to David some more, so she walked back to the Sandman Motel and knocked on the door. When David opened the door she noticed the motorcycle parked in the room and Larry coming out of the shower, clad in shorts. She noted a knee bruise and some scratches on his leg, which he told her he received in a wreck while riding the motorcycle.
David called a truck stop for hamburgers and french fries, and drove the motorcycle to get the food. When he returned, the three ate. According to Susan, Larry was not really sleepy and wanted to talk. The three eventually went to sleep.
Susan was awakened by the telephone ringing, which David answered. It was Lisa calling, who told David that Garner had been shot. She said David was telling Lisa, "No, I don't believe it, I'll be there in a minute, tell mama it's all right," and "things like that."
At trial Susan testified that when Larry heard this news, "He fell out of bed laughing." Larry made no statements, however.
David put his clothes on, told them he would be back before 10:00 a.m., and left on the motorcycle. David had a ten o'clock appointment to try to get aid for Susan and Dustin to help with their bills. After he left, Larry and Susan "got everything together and packed it and got it ready to move."
David returned some time later in Garner's truck, and the three put the belongings in the truck, got gas and drove to Batesville where Larry checked into the Comfort Inn. They took boxes, two or three bags, and a garment bag into the room. They then drove and got some food, and returned to the motel and ate.
Susan and David then left in the truck, Susan driving as told to by David, to some dumpsters on Interstate Highway 55 at the Coldwater exit. David told her to pull up beside the third dumpster. David then got out of the truck and got a sack that Larry had given him out of the back of the truck. It was a grocery sack, and appeared to Susan to be about half full. David placed the sack inside the dumpster, poured motorcycle oil on top of it and set it on fire. They left immediately. They met a state trooper, turned the truck around, and then David drove. He drove down a gravel road between Highways 55 and 51 back to Senatobia.
Susan asked David what was in the sack, and he replied it contained clothes "that had blood and brains on them."
Susan testified that it did not take too much to figure out what had happened. She asked David why they had done it, and had Larry "done it?" She said David nodded his head "yes." He then told her to be quiet and quit asking questions or he would have to hurt her.
They returned to Susan's trailer in Senatobia where some of her furniture was loaded and it was taken to Susan's mother's residence.
Moving back in time to the Garner's residence, on Tuesday night, November 3, Sue told highway patrol investigator C.B. (Creekmore) Wright that she got home about 10:30. Her husband was sitting at the kitchen table drinking, and he told her she had been walking in the yard. She told him he was crazy, and they went to bed about 11:30.
At trial Sue testified she arrived home around 11:00 p.m. She corrected her statement to Wright by saying that Garner told her that he heard her walking in the yard and she told him he was crazy. Garner went to bed and she did, too, around 11:15. They lived in a double trailer with three bedrooms, all on the front side of the house. Glenn's bedroom was next to hers. Garner woke her up getting out of bed, saying he had heard a racket and was going to investigate. She rolled over, and as she did, she "heard a pop," which made her "jump up." She heard Garner call her for help:
[A]nd I jumped to go help, but before I could leave the bedroom, I heard another pop, and I says, no, maternal instincts took over, and I stopped at my son's bedroom, and I took a quilt and throwed it over him and throwed him over in the floor, and I rolled up in it with him, and *313 we stayed there just as still as we could stay until it got quiet enough.
(Vol. IV, p. 283)
The telephone was in the kitchen. Sue had no idea how long she and Glenn remained rolled in the quilt. About 25-30 minutes later, she telephoned her uncle, Joel Hufstickler, and then her son-in-law, David Mayo. According to her, she told Mayo there had been some shooting outside, but she did not know what happened. She also told him to bring some help, not to come alone, and she thought "Woody" had been shot. She heard no motorcycle.
Glenn, called as a defense witness, testified he heard a shot, and then Garner call out, "Sue, come help me." Sue then came into his room and threw him under the covers on the floor. He heard more shots, "and then a great big shot." Then everything got quiet and "we got brave enough to crawl back to the phone and call Uncle Joel and David Mayo." He said the telephone was "in mama's bedroom." He heard no motor vehicle.
D.M. Haynes lived about a quarter of a mile south of Garner. On the night Garner was killed, he heard a shot, went to the door and as he did, he looked at his clock. It was 1:25 a.m.
Tom and Sheila Pollen lived across the road from Haynes. Something woke them, and they heard two shots. It was 1:25 a.m. They also heard a motorcycle coming from Garner's, heard it turn around in their drive, head back towards Garner's residence, and then come back and for the second time turn around in their drive. It then headed north towards Garner's and "kept going." It was "pretty loud." Pollen, who had some experience with motorcycles, testified that a "colored boy" in the neighborhood owned a motorcycle, but it was not that loud.
David Mayo received Sue's telephone call at 2:00 a.m. He put his clothes on and drove to Garner's. He found the body of Garner lying beside his eighteen-wheeler truck, face down almost under the front wheel. Mayo noticed the head "just about gone."
He turned to the house, went to the open front door and yelled for Sue. When she answered, he went inside and turned on the lights. He found her in Garner's bedroom "down beside the bed." He called the police department at Crenshaw and got night watchman Lewellyn, who told him that he could not come. Mayo then telephoned Leo Parrish, town marshal of Crenshaw. After reporting to Parrish, Mayo went inside and drove his car with its headlights on so he could better see the body. He went inside, got a sheet and covered the body. In a matter of minutes, Parrish arrived, and shortly thereafter J.C. Sexton, deputy sheriff of Panola County.
Ralph Sanders, a long time friend of Garner's, drove to Garner's home around 11:00 a.m., November 4. After visiting about thirty to forty-five minutes, he left. About two and a half or three miles from the home, he noticed a blue bag out in the road. He stopped and inspected it and noticed inside a white towel, a partially filled bottle of Old Charter whiskey, and a pack of menthol cigarettes. There was also a red flashlight in the bag. The towel had a strong odor of women's perfume.
Then, further along on a bridge, he noticed a pull-over t-shirt, size 18. It was dusty. That afternoon he delivered the bag and its contents and the shirt to Parrish.[1]
Sanders was not through. The next day, Thursday, November 5, he, along with Jimmy Gregory, Charles Wilkerson and Cecil Hall, three other friends of Garner's, went investigating. About a half mile beyond the location of the bag, as they crossed a bridge, Wilkerson noticed a shotgun down in the creek. One of them left and law enforcement officers were summoned. Some time later law enforcement officers *314 came to the creek and recovered the shotgun and also a pistol. Because of the markings on the shotgun, it was easily identified as the 12-gauge pump shotgun belonging to Garner. By later measurement by Wright, it was determined that the bag was 3.9 miles from Garner's and the creek where the weapons were found was 4.6 miles distance.
On the morning of November 4, Sue gave David, her son, some money in order for Wilkins to buy some clothes. There is nothing in the record indicating that Wilkins ever came to the Garner home that day.
Wright's investigation revealed that Larry Wilkins had first stayed in the Howard Johnson Motel in Senatobia, then spent a night with his brother Barry in the trailer park, and on October 31 through November 4, he was checked into Room 35 at the Sandman Motel.
David Barnes was questioned and arrested on November 5. On Friday, November 6, at approximately 3:00 p.m., Wright went to Room 106 at the Comfort Inn and arrested Wilkins. In the room he found a baseball cap with blood stains on it, a fifth of seven-year-old Old Charter whiskey, a half pint of gin, and three packs of Richland brand menthol cigarettes.
Barnes was placed in the Panola County jail and over a period of several days, one Sidney Layne McKenzie, who had been arrested on some sexual deviancy charge, was in an adjoining cell to Barnes.
On February 28, 1988, the grand jury of the First Judicial District of Panola County indicted Wilkins for the murder of Garner. David Barnes was also indicted as an accessory after the fact to Garner's murder. In late September, 1988 (the record does not give the exact date), Barnes was tried and convicted. Wilkins' trial began October 3, 1988.
At trial through the testimony of Linda Walker, cashier at the Sandman Motel restaurant, Whit Allen and Lynn Still, it was developed that late in the afternoon of November 3, Wilkins bought ten cokes and told her that he was going to have a party that night with some friends, and asked her if she had a car. He wanted to get something to drink. He later invited her from his room to have a drink with him, which she declined. She called Whit Allen, who drove Wilkins to Still's liquor store in Como after the polls closed. At the liquor store he purchased two fifths of Old Charter whiskey and a half pint of gin. He gave the gin and four dollars to Allen. Wilkins then went to the beer store and purchased a case of Budweiser bottled beer. Allen drove Wilkins back to the Sandman Motel, and saw a motorcycle at Wilkins' room.
Stephen T. Hayne, M.D., the pathologist who examined Garner's corpse, testified Garner had been shot six times with a small caliber weapon and once with a shotgun. Five of these wounds were lethal. He had recovered four .22 caliber bullets from the body. He said that some of the wounds received were with the muzzle and skin in contact, some two to two and one-half inches away, and some a greater distance. He could not give the distance of the shotgun wound because of massive destruction to the head. Garner was shot once in the temple, another just below it another to the chin, another to the left side of the back of his head, another in the neck, another on the back of the left shoulder, and another in the left rib cage.
At trial the pistol recovered from the creek was identified as being a wooden-handled H & R .22 caliber seven and one-half inch barrel pistol, "just like" the pistol owned by DeLayne Mayo, Jr., brother to David. His mother, Mrs. Anna Mayo, had noticed the pistol on the seat of her husband's pickup in late September, 1987, and took it into the house, where she put it in the top dresser drawer in her bedroom.
It was also developed at trial that Glenn Dyer was later in this room and David Barnes was in the Mayo house as well, and had an opportunity to take the pistol. No one ever testified, however, that either in fact did take the pistol.
John M. Allen, ballistics expert with the Mississippi Crime Laboratory, testified that the bullets recovered from Garner's body bore the same characteristics as bullets *315 fired from the recovered .22 pistol, although it could not be positively established that they in fact could only have been fired from it.
David Barnes was called to the stand as a witness for the State, and when asked by the district attorney if he and Sue had gone to Memphis to pick up Wilkins on or about October 29, 1987, he took the Fifth Amendment. The circuit judge ordered him to answer the question.
Robert H. Broome, who had represented Barnes in his trial, but was not the attorney for Wilkins, asked to be heard. The circuit judge then conducted a hearing in chambers.
Broome informed the court that Barnes had just been convicted but not sentenced, and the appeal process had not been completed, and objected to the court's ordering him to testify.
The State responded by granting Barnes complete immunity from any charge as a principal to the murder, and also stated that any testimony he gave could not be used against him on retrial of his case if it were reversed on appeal. The district attorney also informed the court that during Barnes's trial on the Friday of the previous week, Barnes had taken the stand as a witness in his own defense where he testified at length under direct examination of Broome, and then was cross-examined by the district attorney.
The circuit judge directed Barnes to answer the questions, but stated he would determine, based on the questions asked, if Barnes had a right to invoke the Fifth Amendment. Broome objected to requiring Barnes to answer the State's questions. Counsel for Wilkins also objected to the State's questioning of Barnes.
As a witness for the State, Barnes testified that he and his mother had gone to Memphis on October 28 or 29, picked up Wilkins, returned to Senatobia and checked into the Howard Johnson Motel. He and Wilkins stayed there one night, and then went to his Uncle Barry's and spent another night. Then he and Wilkins went to the Sandman Motel. He testified that Wilkins got Allen to drive him to the liquor store in Como and purchased two fifths of Old Charter whiskey and some Budweiser beer. He had borrowed Mayo's motorcycle on Friday night, October 30, and had it on November 3. He did not know whether Wilkins smoked Richland menthol cigarettes or not. On the night of November 3, he and Wilkins had sat around watching television, and he, Barnes, had drunk some whiskey. Wilkins left some time after dark on the motorcycle. He did not know what time because they had no clock. When Wilkins returned, he took a shower, and while he was in the shower Susan Barnes came to the room.
The district attorney asked Barnes if Wilkins had told him when he left that he was going to do something illegal and would not tell him what it was, and Barnes denied having been told that. He was shown the blue bag found by Sanders on the road, and said he did not believe he had ever seen it. He testified that after Wilkins had taken a shower he rode the motorcycle to get some food.
Barnes further testified that the next morning when he received the telephone call that Garner had been killed, he reported this to Wilkins and Susan, and then drove the motorcycle to Garner's. He denied ever asking Wilkins if he had killed Garner.
After Barnes returned from Garner's home, he admitted that he and Susan drove to the Coldwater exit where he put "garbage" in the dumpster, but he said he never saw any bloody clothes, and he denied telling Susan that Wilkins had killed anybody. He testified that he and Susan took Wilkins to the Comfort Inn in Batesville.
The State then questioned Barnes about statements he had made to McKenzie and Highway Patrol Investigator Wright.
He first testified that he and McKenzie were in adjoining cells. He was then asked if he had any conversations with McKenzie and replied: "Not much, because one of the trusties told me he was in there for being gay, so I didn't talk to him much at all." He denied telling McKenzie that Wilkins *316 had killed Garner, and denied ever discussing the slaying with him. He denied telling McKenzie that he had destroyed some bloody clothes. He denied that Wilkins asked him to destroy clothes. He denied telling Wright that he had taken bloody clothes to the dumpster. He denied telling Wright that Wilkins had told him that he had killed Garner.
Following Barnes's testimony, the State called as the next three witnesses McKenzie, Susan and Wright. The defense objected to McKenzie testifying as to what Barnes had told him, and the State argued that under Rules 613 and 801(d)(1) Mississippi Rules of Evidence (MRE), they were entitled to bring out prior inconsistent statements as part of their case.
The court ruled:
So, as I read the Williamson case [Williamson v. State, 512 So.2d 868 (Miss. 1987)] and as I read the Rules of Evidence, clearly this is now a classic case of an effort to impeach testimony. I think it's permissible, and I'll permit it. Based on the record and based on what the testimony of Barnes is, I feel like the procedure is proper, so the objection has been made, and it will be overruled.
(Vol. IV, 388-89)
McKenzie testified that he and Barnes had been in jail together around ten days. He testified that Barnes told him that he had nothing to do with killing Garner, but that Wilkins had killed Garner. He said Barnes told him that he took some bloody clothes that Wilkins had worn, put them in a box and took them to a Dempsey Dumpster where he put oil on them and set them on fire. He testified Barnes said that his wife Susan was with him. He testified that Barnes told him Wilkins had gone to the house on the motorcycle:
A. And got to the house and called Woody out. Woody come out; he started shooting him, and Woody caught up with him and got him down on the ground and was choking him out, and then he believed that his mother come out with a shotgun because it was broken and she had put it up and didn't want the kids to play with it and shot him because Woody had Larry down on the ground choking him.
He said Barnes related that Wilkins had told him he emptied the.22 caliber pistol at Wilkins.
Susan testified to the facts as above related.
Wright testified that Barnes related that Wilkins had told him that he had killed Garner, and that Wilkins had asked him to take his clothes that had blood and brains on them and get rid of them for him. He then drove the truck to the dumpster, at the Coldwater exchange, got out and put the sacks in the dumpster and poured oil on them and set them afire. He said that the blue bag found by Sanders was identified by Barnes as being the bag Wilkins had when he left, and in it was a fifth of Old Charter whiskey and some other things.
Sue Garner's testimony indicated that she had a $25,000 life insurance policy on the life of Garner.
The defense offered David Chambers and Barry Wilkins as alibi witnesses.
Wilkins did not testify.
The court instructed the jury through Instruction C-12 that Wright's testimony regarding Barnes's statement could only be used for impeachment purpose and not as substantive evidence.
In both the opening and rebuttal arguments of the prosecution (Vol. VI, 653; 680), the testimony of Barnes was weighed against that of Wright and McKenzie, and the jury told that either Barnes was lying or the others were. The jury was asked to determine which was lying, Barnes, who had every reason to, or Wright or McKenzie, who had no reason whatever to do so.
The jury found Wilkins guilty and he was sentenced to life imprisonment. He has appealed.

LAW

CALLING BARNES AS A WITNESS FOR PURPOSE OF IMPEACHMENT
As noted, during the course of the trial, Barnes was called as a witness for the *317 State, and over defense objection, testimony as to pretrial statements and conduct elicited from him as a predicate to having it contradicted in succeeding order by Susan Barnes, McKenzie and Wright. Wilkins complains this was error.
The State had a right to call Barnes as a witness, and to ask him any questions it chose relevant to this murder. This does not necessarily mean, however, that the State had the right to ask him about any contradictory pretrial statement he made and upon his denial to offer these pretrial statements in evidence, all as part of its case in chief.
Although Wilkins made no complaint on appeal as to Susan Barnes's testimony of statements Barnes made to her, because some question might be raised on retrial, we hold such testimony was not hearsay and was competent evidence under MRE 801(d)(2)(E): "[A] statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."
In driving to the Coldwater exit and dumping and burning the sack in the dumpster, Barnes was acting in furtherance of a conspiracy with Wilkins to destroy evidence of Wilkins' guilt of murder. Any statements he made to Susan during this time were competent evidence as part of the State's case in chief. Ponthieux v. State, 532 So.2d 1239, 1243 (Miss. 1988); Williamson v. State, 512 So.2d 868, 879 (Miss. 1987); Mitchell v. State, 495 So.2d 5, 11 (Miss. 1986). MRE 801(d)(2)(E) places the statements to Susan in a different category than those of McKenzie and Wright.
Neither does Wilkins complain on appeal of the extensive testimony of McKenzie as to statements made to him by Barnes when they were both in the Panola County jail. We therefore do not address the competency of this evidence. Miss.S.Ct.R. 28(a)(1)(3); Read v. State, 430 So.2d 832, 838 (Miss. 1983); Prueitt v. State, 261 So.2d 119, 125 (Miss. 1972).
Wilkins does complain of the State's calling Barnes as a witness, asking him whether Wilkins had told him he had killed Garner, and if he had taken bloody clothes to the dumpster, and upon his denial that this had occurred, asking him if he had not made contrary statements to Wright, and upon his denial that he had made such statements, calling Wright as a witness and permitting him to testify that Barnes indeed had told him Wilkins admitted killing Garner, and that he (Barnes) had taken bloody clothes to the waste disposal dumpster at Coldwater.
Was this testimony by Wright competent evidence? We hold that it was not. In order to explain our conclusion, it is necessary to examine the historical basis for our holding and the confusion which has resulted from the United States Congress's adoption of the Federal Rules of Evidence, subsequently adopted by this Court as the Mississippi Rules of Evidence, and in particular, Rule 607.

A. THE FACT FINDING PROCESS
The factfinder, whether it be jury or judge, or both of them, has two objectives in evaluating the testimony of any witness:
1. How much does the witness really know of the events he relates as facts; and
2. Is he accurate and truthful in his relation of the events?
Factfinders want evidence that is reliable, trustworthy.
The purpose of a trial is to furnish the factfinder the best opportunity, the best basis possible to reach these objectives.
These objectives and this purpose of a trial never change, but are always the same.
The lawyer's role in this enterprise varies, however. With the run-of-the-mill witness, questioning by the attorney who calls him seeks to demonstrate that the witness does indeed have first-hand knowledge of what he relates and that he is truthful and accurate.
The role of the adversary is to show, if possible, that one or both these objectives has not been satisfied.
Yet it often happens that while some of the facts the witness observed are *318 favorable, others are not. The lawyer therefore knows that by placing this witness in the witness chair, the factfinder is going to hear testimony that does not help his client's case. Quite naturally, the lawyer attempts to minimize the unfavorable, frequently by attempts to nudge his witness away from the unfavorable testimony. Courts have not permitted a party to call a disinterested witness, and after eliciting favorable testimony from him, attempt to cross-examine him as to the testimony that is unfavorable. Moffett v. State, 456 So.2d 714, 718 (Miss. 1984); Gardner v. State, 368 So.2d 245, 249 (Miss. 1979); Manning v. State, 188 Miss. 393, 195 So. 319 (1940). Courts have called this the "voucher rule." Moffett, 456 So.2d at 718. It is something in the nature of an estoppel to place a totally disinterested witness on the stand and ask the factfinder to believe that which is favorable to your case, yet reject that which is unfavorable.
A different rule prevails where a party, in order to prove his case, must call the adverse party or a clearly hostile witness to the stand. In such instance, courts allow leading questions to be addressed to such witnesses. Miss. Code Ann. § 13-1-53, repealed Ch. 573, § 141 Laws 1991; MRE Rule 611(c).
Finally, there is the witness who unexpectedly on the witness stand becomes hostile to the party calling him, or who relates a story completely different from his pretrial statements. In such instances the lawyer, caught by surprise, is permitted to ask leading questions. Moffett, 456 So.2d at 718.
Courts have had to struggle not only with the manner in which a witness may be questioned by the party calling him, but also the weight which the factfinder is authorized to give to a pretrial contradictory statement at odds with the witness's trial testimony. May the pretrial out-of-court statement be considered as substantive evidence of the fact it relates? And, if it cannot be considered as substantive evidence, how can a court be sure the jury did not in fact so consider it?
If Wilkins told Barnes that he killed Garner, this was an admission and would have been competent evidence for Barnes as a witness to relate. It was admissible as an exception to the hearsay rule, or indeed as we have held in Yawn v. State, 220 Miss. 767, 71 So.2d 779, 780 (1954), was not hearsay but direct evidence. "However, it has never been the rule that voluntary admissions of a defendant himself made either in or out of court are hearsay. They are admissions against interest." Yawn, 220 Miss. at 771, 71 So.2d at 780. And obviously, if Barnes had testified that he did transport a bag of bloody clothes to a dumpster and set it afire, this was not hearsay but direct evidence of facts of which Barnes had personal knowledge.
Wright's testimony as to what Barnes told him was hearsay, however. It was not admissible under our pre-rules decisions in the absence of showing that the State had been "surprised" by Barnes's testimony at trial. Then, and only then would the State have been permitted to offer such statements to Wright solely to impeach Barnes's credibility as a witness, and not as substantive evidence of the facts related in pretrial statements. Moffett, 456 So.2d at 718-19; Allison v. State, 447 So.2d 649, 650 (Miss. 1984); Shelton v. State, 445 So.2d 844, 847 (Miss. 1984); Davis v. State, 431 So.2d 468, 473 (Miss. 1983); Gardner v. State, 368 So.2d 245, 249 (Miss. 1979); Denton v. State, 348 So.2d 1031, 1034 (Miss. 1977); Murphy v. State, 336 So.2d 213, 216-217 (Miss. 1976); Magee v. Magee, 320 So.2d 779, 783 (Miss. 1975); Sims v. State, 313 So.2d 388, 391 (Miss. 1975); Hammons v. State, 291 So.2d 177, 179 (Miss. 1974); Hooks v. State, 197 So.2d 238, 240 (Miss. 1967) (reversible error to admit such testimony in absence of showing surprise); Hall v. State, 250 Miss. 253, 165 So.2d 345, 350 (1964); Manning v. State, 188 Miss. 393, 398, 195 So. 319, 320 (1940); Bove v. State, 185 Miss. 547, 554, 188 So. 557, 558 (1939); State of Mississippi v. Durham, 444 F.2d 152, 156 (5th Cir.1971); Ellis & Williams, Mississippi Evidence § 4-8 (1983).
*319 Courts generally made a further restriction upon the introduction of inconsistent pretrial statements, namely: the inconsistent statement had to be about a material, not a collateral matter. Because Barnes would have been competent to testify to these facts as a willing witness, this was a material, not a collateral matter. White v. State, 532 So.2d 1207, 1217 (Miss. 1988); Price v. Simpson, 205 So.2d 642, 643 (Miss. 1968); Jones v. State, 180 Miss. 210, 177 So. 35, 37 (1937); Witt v. State, 159 Miss. 478, 132 So. 338 (1931); Williams v. State, 73 Miss. 820, 19 So. 826 (1896).
The reasoning behind the courts' reluctance to permit a party to introduce prior inconsistent statements made by his own witness was the fear that an accused might be convicted upon unsworn pretrial statements. United States v. Morlang, 531 F.2d 183 (4th Cir.1975). Judges have endeavored to minimize this danger by instructing a jury that the unsworn pretrial statements could not be considered as "substantive" evidence, but only to impeach the credibility of a witness who by his testimony has ambushed the party calling him.
It has also been of chronic concern to courts whether a jury would or could "divest their minds of the statement" proved to have been made by the witness, and not treat it as substantive evidence. As stated in Williams, 73 Miss. at 826, 19 So. at 327:
If the jury believed that he made such statement, would it be natural for them to obey the instruction of the court, and restrict their consideration of it to the impeachment of the witness? They might endeavor to do so, and believe they were doing so, and still be involuntarily and unconsciously influenced thereby.
See also, Moffett, 456 So.2d at 720.
Indeed, permitting a jury to hear such testimony and then instructing it not to consider it except for "impeachment" has been called by one scholar "a pious fraud." Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv. L.Rev. 177, 193 (1948).
Clearly there was no element of surprise in this case. The State did not claim surprise; Barnes had testified in his own defense in his own trial a week previously, and was cross-examined. While his testimony in his own trial is not in this record, it is inconceivable that he did not then make the same denials as to the statements to Wright and McKenzie that he made in Wilkins' trial. Had he testified in his own trial that he had made such statements to Wright and McKenzie and they were correct, he would have been admitting guilt on the witness stand to being an accessory after the fact, for which he had been indicted. Also, while the State cross-examined Barnes at length about the statements he purportedly had made to Wright and McKenzie, there was a conspicuous absence of any cross-examination as to inconsistent testimony from his own trial.
There being no surprise to the State in Barnes's testimony, under all our pre-rules decisions it was not competent to allow Wright's testimony as to the pretrial statements.
Having said all this, it should also be noted that we observed in Moffett that "the rule is not in favor," 456 So.2d at 718, thus signaling that changes might be made. There have been critics of the rule.[2] As observed by Judge Learned Hand in DiCarlo *320 v. United States, 6 F.2d 364, 368 (2nd Cir.1925):
If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court.
In "Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613 and 607," Professor Graham in his seminal article in 75 Michigan Law Review 1565, 1573 (1977) states:
In summary, the opponents of the Orthodox Rule argue that, so long as the witness is in court and subject to cross-examination, the hearsay problems are eliminated and prior inconsistent statements of the witness should be substantively admissible. They contend further that substantive admissibility is desirable because the proximity of prior statements to the event in question makes them more trustworthy than in-court testimony and because substantive admissibility protects parties from turncoat witnesses. Finally, they urge that the Orthodox Rule does not accomplish its primary purpose because juries are unable or unwilling to distinguish between statements admitted substantively and those admitted solely as evidence of the witness' credibility.

B. CONFUSION CREATED BY FEDERAL RULES OF EVIDENCE
The critics of the orthodox rule initially prevailed because the rules of evidence recommended by the federal advisory committee and submitted by the United States Supreme Court to Congress for approval would have permitted a party to freely impeach his own witness and use it as substantive evidence.
Rules 607 and 801(d)(1)(A) as proposed read:
Rule 607. Who May Impeach
The credibility of a witness may be attacked by any party, including the party calling him.
Rule 801. Definitions
The following definitions apply under this article.
(d) Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony.[3]
After deliberation in both houses of Congress, Rule 607 as proposed was approved. Rule 801(d)(1)(A), however, was amended to read:
(d) Statements which are not hearsay
A statement is not hearsay if 
(1) Prior statement by witness
The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition. (Emphasis added)
The concern of Congress, especially the House committee, was that a prior inconsistent statement would be abused in its use against a criminal defendant, and whether or not the "prior statement was indeed made and that subtle influence, coercion, or deception has not impaired its reliability." Graham, 75 Mich.L.Rev. at 1582. Wright & Graham, § 6093 at 497. Therefore, to remove the hearsay objection from a prior inconsistent statement and permit its use as substantive evidence, it was necessary that the prior statement had been given under oath in a testimonial setting.
The Congressional intent can be easily ascertained as to pretrial inconsistent statements given under oath in a testimonial *321 setting. This is not hearsay, and if properly introduced under Rule 613 may be considered as substantive evidence by the factfinder.
But what about all other pretrial inconsistent statements? Rule 607 must be read in conjunction with Rule 801(d)(1)(A) as enacted by Congress. By changing proposed Rule 801(d)(1)(A) and adopting Rule 607 as proposed, Congress created an ambiguity which legal commentators have struggled with since the adoption of the Federal Rules of Evidence, Pub.L. 93-593, Jan. 2, 1975, 88 Stat. 1929. By amending proposed Rule 801(d)(1)(A) did Congress intend to reduce the sweep of 607? Because Congress did in fact significantly change Rule 801(d)(1)(A) from the proposed rule, the weight of authority among them is that in one way or another, either by interpreting or amending Rule 607 to so read, or by interpreting Rule 403 to require it, the pre-rules requirement of surprise and damage should be present before an inconsistent statement is competent.[4]
Without giving this as the specific reason for their doing so, federal courts in applying Rule 607 have in fact generally refused to permit a party to impeach his own witness in the absence of showing surprise using language such as: "We conclude that it was error to allow the government to misuse Gonzalez' testimony as a `subterfuge' to get otherwise inadmissible testimony before the jury." United States v. Crouch, 731 F.2d 621, 624 (9th Cir.1984). Or, as in United States v. Miller, 664 F.2d 94, 97 (5th Cir.1981), where the Court noted: "Of course, the prosecutor may not use such a [prior inconsistent] statement under the guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not otherwise admissible." (Brackets added; emphasis added)
And, as stated in United States v. Hogan, 763 F.2d 697, 702 (5th Cir.1985):
The prosecution, however, may not call a witness it knows to be hostile for the primary purpose of eliciting otherwise inadmissible impeachment testimony, for such a scheme merely serves as a subterfuge to avoid the hearsay rule.
Also, United States v. Fay, 668 F.2d 375, 379 (8th Cir.1981); United States v. DeLillo, 620 F.2d 939, 946 (2nd Cir.1980), cert. denied 449 U.S. 835, 101 S.Ct. 107, 66 L.Ed.2d 41 (1980); United States v. Sebetich, 776 F.2d 412, 427-28 (3rd Cir.1985).
The trouble with this rationale is first, as perceptively noted in the dissenting opinion in Cooper v. State Farm Fire & Cas. Co., 568 So.2d 687, 700 (Miss. 1990) (Robertson, J., dissenting), it makes admissibility of evidence depend on what is in the attorney's head, a rather difficult undertaking; and second, if there is in fact no surprise, the only possible motive for attempting to impeach one's own witness is to get otherwise inadmissible testimony into evidence. Administering the rules of evidence would be much easier if the Federal courts of appeal had, as the commentators suggested, directly interpreted Rule 607 as requiring surprise before permitting a party to impeach his own witness with an unsworn prior inconsistent statement, rather than reaching the identical result by indirection.[5]

C. MISSISSIPPI RULES OF EVIDENCE
The Mississippi Supreme Court in promulgating the Mississippi Rules of Evidence in September, 1985, adopted Rules 607 and Rule 801(d)(1)(A) identically as *322 written in the Federal Rules. The bench and bar would have been better served had the ambiguity created by reading Federal Rule 607 in conjunction with Federal Rule 801(d)(1)(A) been removed in our rules, either by use of different language or by a comment to the rules.[6]
Be that as it may, our decisions since the adoption of the Mississippi Rules of Evidence have followed the rationale of the federal courts, and have not permitted the introduction of prior inconsistent statements in the absence of a showing of surprise. Thus in Cooper v. State Farm Fire & Cas. Co., 568 So.2d at 691, in reversing a case in which prior inconsistent statements to three insurance company representatives were admitted in the circuit court, we held:
An extensive and careful reading of the record as a whole ... shows that State Farm, knowing all the while what the responses would be, offered the testimony of Susie Arnett for no other reason than to impeach her denials with the hearsay testimony of McClain, Brown and Lomenick [the insurance company representatives]. As such, the testimony of McClain, Brown and Lomenick was offered "under the guise of impeachment for the primary purpose of placing before the jury substantive evidence" in its case in chief which was "not otherwise admissible as a device to avoid the hearsay rule." The admission of this testimony was error. [Brackets added]
And, in Brown v. State, 556 So.2d 338 (Miss. 1990), a case in which the only evidence pointing to the defendant's guilt was a prior inconsistent statement of a State's witness, we reversed and rendered a conviction, after quoting at length Moffett, our pre-rules decision, as major authority therefor, and never bothered to mention the Mississippi Rules of Evidence. We held in Brown that unsworn pretrial inconsistent statements of a witness could never be used as substantive evidence.
Harrison v. State, 534 So.2d 175 (Miss. 1988), does hold that Rule 607 permits a party to impeach his own witness, but since it was never argued on appeal in that case that the purpose of the State in introducing prior inconsistent statements was to get otherwise inadmissible evidence before the jury as a subterfuge, we affirmed.
To remove any doubt as to the meaning of Rule 607, we hold today that in its application, just as in our pre-rules decisions, before a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness, it will be necessary that he show surprise or unexpected hostility, and that such statement can never be used as substantive evidence. We also hold that under the "unfair prejudice, confusion of the issues, or misleading of the jury" provisions of Rule 403, the circuit judge should consider whether a cautionary instruction to the jury will be sufficient to keep the jury from treating the unsworn pretrial inconsistent statement as substantive evidence, and if not, the statement should not be introduced.[7]

*323 D. REFUSAL TO PERMIT DEFENSE IMPEACHMENT OF McKENZIE
McKenzie had been arrested and jailed on an unnatural intercourse charge. At the time of Wilkins' trial, he had not been convicted, and the record does not show whether he in fact had even been indicted.
The State moved for and secured an order in limine preventing defense counsel from cross-examining McKenzie about this charge. Wilkins now claims that the court's refusal to permit him to attack McKenzie's credibility by asking him about this charge was error.
In Blanks v. State, 451 So.2d 775, 778 (Miss. 1984), we held that a witness cannot be cross-examined regarding his involvement with crimes for which he has not been convicted, and in Vick v. Cochran, 316 So.2d 242, 251 (Miss. 1977), that a witness cannot be impeached by showing merely that he has been charged with a crime. Also, Barlow v. State, 233 So.2d 829, 832 (Miss. 1970).
Even where a witness has been convicted of a crime, under Rule 609(a) of the MRE it is now discretionary with the trial court whether to permit cross-examination as to such conviction for impeachment purposes. Saucier v. State, 562 So.2d 1238, 1245 (Miss. 1990); McInnis v. State, 527 So.2d 84, 88 (Miss. 1988); Johnson v. State, 525 So.2d 809, 811 (Miss. 1988); Peterson v. State, 518 So.2d 632, 636 (Miss. 1987).
Defense counsel offered no other purpose for attempting to cross-examine McKenzie than to impeach his credibility, and the court did not err in refusing to permit this line of cross-examination.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.
PITTMAN, J., concurs in result only.
NOTES
[1] When the contents of the bag were emptied and inspected by investigator Wright, he found the Old Charter, seven years on the label, a red plastic handle flashlight, loose gum, a Richland brand green package of 25 menthol cigarettes, a cigarette lighter, some matches, and a half pint of gin. The pull-over shirt was then in the bag as well. These were all made exhibits and introduced into evidence at trial.
[2] See generally McCormick's Handbook of the Law of Evidence § 251 (2d ed. E. Cleary 1972) [hereinafter cited as McCormick]; 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)f (1) [01] (1976) [hereinafter cited as [Weinstein]; 3A J. Wigmore, Evidence §§ 1018 & 998 n. 3 (J. Chadbourn ed. 1970); Falknor, The Hearsay Rule and Its Exceptions, 2 U.C.L.A. L.Rev. 43 (1954); McCormick, The Turncoat Witness: Previous Statements as Substantive Evidence, 25 Texas L.Rev. 573 (1947); Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177 (1948); Reutlinger, Prior Inconsistent Statements: Presently Inconsistent Doctrine, 26 Hastings L.J. 361 (1974); Silbert, Federal Rule of Evidence 801(d)(1)(A), 49 Temp.L.Q. 880 (1976). [brackets original]

Graham, "Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613, and 607," 75 Mich.L.Rev. 1565, 1568 n. 10 (1977).
[3] Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183, 293 (1972); Graham, 75 Mich.L.Rev. at 1575.
[4] Graham, "Employing Inconsistent Statements," 75 Mich.L.Rev. 1565; Graham, "Examination of a Party's Own Witness Under the Federal Rules of Evidence: A Promise Unfilled, 1976" 54 Tex.L.Rev. 917, 979; Ordover, "Surprise! That Damaging Turncoat Witness is Still with Us: An Analysis of Federal Rules of Evidence 607, 801(d)(1)(A) and 403," 5 Hofstra L.Rev. 65 (1976); Graham, "The Relationship Among Federal Rules of Evidence 607, 801(d)(1)(A), and 403; A Reply to Weinstein's Evidence," 55 Tex.L.Rev. 573 (1977); 3 J. Weinstein & M. Berger, Weinstein's Evidence 607(1) at 19-21; Wright & Graham, § 6093 Federal Practice & Procedure (1989); Luisell & Mueller, Federal Evidence, § 209 (1981).
[5] It is interesting to note that the Supreme Court of Appeals of West Virginia has interpreted its Rule 607 precisely as the advisory committee to the U.S. Supreme Court intended it. State v. Kopa, 173 W. Va. 43, 311 S.E.2d 412 (1983).
[6] With the alarm already having been sounded several years previous by leading scholars on evidence, fn. 2, supra, and the misunderstanding of the application of Rule 607 encountered in the federal courts, this Court could either have adopted Rule 801(d)(1)(A) as originally proposed by the United States Supreme Court, which permits unsworn prior contradictory statements to be admitted as substantive evidence, or made it plain that Rule 607 was not to be considered a departure from our pre-rules decisions, not left the bench and bar dangling somewhere in between.

Indeed, in Moffett, 456 So.2d at 718, a pre-rules decision, we stated:
We recognize today that the rule [against impeaching one's own witness] is not in favor... . It has been abrogated altogether in civil cases. Rule 43(b)(4) Miss.R.Civ.P., effective January 1, 1982, provides that the "credibility of a witness may be attacked by any party, including the party calling him." (Emphasis added)
Rules 43(b)(4) and 607 containing identical language, the statement in Moffett suggested that what the State in fact did in this case would, after the adoption of the Mississippi Rules of Evidence, be entirely proper.
[7] MRE Rule 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.