IN THE SUPREME COURT OF MISSISSIPPI
NO. 93-KA-00299-SCT

*MICHAEL PARKER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/11/93 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DONALD L. KILGORE |
| | J. MAX KILPATRICK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOLENE M. LOWRY |
| DISTRICT ATTORNEY: | TURNER, KEN, |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 3/13/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/7/97 |

**BEFORE SULLIVAN, P.J., PITTMAN AND BANKS, JJ.**

**PITTMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. On July 14, 1988, the grand jury of Neshoba County, Mississippi, indicted Michael Parker for capital murder in the forcible rape and murder of Rachel Morgan. The case was initially tried by a Neshoba County jury and a guilty verdict was rendered on October 19, 1989. The case was then appealed to this Court and was reversed and remanded, based on an evidentiary matter, on August 31, 1992. *See Parker v. State*, 606 So. 2d 1132 (Miss. 1993).

¶2. The second trial was also heard before a Neshoba County jury, and the jury again found Parker guilty of capital murder. On March 11, 1993, the Circuit Court of Neshoba County, Mississippi, sentenced Parker to life imprisonment. Thereafter, Parker filed a motion for judgment notwithstanding the verdict and/or a new trial. The motions were overruled. Aggrieved by the decision of the lower court, Parker appeals to this Court and assigns the following as error:

**I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN THE SELECTION**

**AND COMPOSITION OF THE JURY IN THAT IT (A) FAILED TO QUASH THE SPECIAL VENIRE, AND (B) ALLOWED THE STATE TO CHALLENGE BLACK MEMBERS OF THE PANEL WITHOUT RACIALLY NEUTRAL EXPLANATIONS.**

**II. THE STATE PREJUDICED THE JURY IN ITS CLOSING ARGUMENT BY REFERRING TO MATTERS WHICH THE SUPREME COURT HAD PREVIOUSLY RULED NOT TO BE ADMITTED ON THE RETRIAL OF THIS CASE.**

**III. THE COURT ERRED IN AMENDING DEFENSE INSTRUCTION D-2.**

**IV. THE COURT ERRED IN ALLOWING THE STATE OF MISSISSIPPI TO CALL JOSEPHINE PARKER ADVERSELY AS A REBUTTAL WITNESS, AND FURTHER COMPOUNDED THE ERROR BY ALLOWING THE STATE THEN TO PRODUCE REBUTTAL WITNESSES TO THEIR OWN REBUTTAL WITNESS.**

¶3. We find that Issues I, II and III are without merit and affirm the lower court on these matters. However, Issue IV is meritorious and we hold that the decision of the lower court is reversed and the case remanded for a new trial.

## FACTS

¶4. On January 26, 1988, the body of Rachel Morgan was discovered on the railroad tracks adjacent to the Neshoba County Gin, a local feed mill. She was found lying on the east side of the railroad tracks in some thorn bushes and briars. She had on a pair of blue jeans with one leg off. She had no panties on, and a blue jean jacket was pulled up over her head. The body was approximately 78 feet from the railroad track. The body was covered with some sort of syrupy substance which had apparently come from the feed mill across the track.

¶5. Officer Bobby Anderson, an investigator for the Philadelphia Police Department, initially interviewed Parker on January 26, 1988. Parker told him that he had been riding around with Junior Burton and had been drinking gin the night of January 25, 1988. Officer Anderson testified that he observed a small scratch on the face of Parker and that upon examination of his torso found two more scratch marks on Parker's back. He also observed a scratch mark on one of Parker's legs. Officer Anderson further testified that he interviewed Parker on January 27, 1988, at City Hall. In his second statement, Parker stated that he had been riding around with Burton and that he dropped him off at Ethel Harris's home where he stayed for approximately ten minutes. After that he went home where he got sick and threw up. A sexual assault kit was obtained from the body of Morgan and from Parker. Blood and saliva samples were taken from Michael McDougal[1].

¶6. Ethel Harris testified that she saw Parker on the night of January 25, 1988, at approximately 10:30 or 11:00. He stayed approximately 10 or 15 minutes and told her he was going to go "get him some." Billy Joe Seales testified that he operated a grocery store in Philadelphia, Mississippi, and that on his way home he saw Parker between 11:00 and 12:00 on the night of January 25, 1988. He also saw Morgan at approximately the same time. They were approximately 20 feet apart. The witness testified that he didn't think the two parties could see each other.

¶7. Dr. James Neal, a pathologist, testified that he performed an autopsy on Morgan on January 26,

1988. He noted that Morgan's body contained a lot of bruises in various areas and abrasions in various areas of her body including around her neck, chest, face, knees and back. The most notable thing that he had observed in the autopsy was the presence of a bruise on the lower portion of her rib cage on the right side. He also noted bruising on the side of the vaginal vault and that it was consistent with a male penis being penetrated into her vagina. It was his opinion that Morgan died of strangulation and that supporting his view was the presence of the abrasions and bruising in the neck and the fracture of the bone in her throat and the bleeding of the tissues in her throat.

¶8. Mark Davis testified that on the morning that Morgan's body was found, he saw Parker and that he gave him a ride to drop some clothes off at the laundry. Parker gave him directions as to which street to travel. Davis was with Parker for approximately 10 minutes and characterized his conduct as being normal. Don Evans Huddleston testified that he was on his way to work along the railroad tracks at approximately 6:30 in the morning when he met Parker near the Neshoba County Gin. Dorene McAffee testified that she was on her way to work on the morning of January 26, 1988, around 6:45 a.m. and that she saw Parker walking along the street near the gin.

¶9. Jimmie Lee Shannon owned a wash house in Philadelphia, Mississippi, in January 1988. On the morning of January 26, 1988, he saw Parker go into the wash house between 6:30 and a quarter to 7:00 a.m. He was washing two pair of pants and a shirt that were all frozen.

¶10. Deborah Haller of the Mississippi Crime Lab testified that she examine and tested sexual assault kits of Parker and Morgan. The test results determined that Parker was a non-secretor and the seminal fluid on the vaginal swab taken from Morgan's sexual assault kit was also indicative of a non-secretor. Haller could not determine if there were secretions from a secretor. The enzyme tests revealed that Morgan was a PGM 2-1 and that McDougal was also a type PGM 2-1. Semen from the vaginal swab from Morgan's body also contained PGM 2-1. She was not able to rule out McDougal as a sex partner to Morgan.

¶11. George Herrin, a molecular biologist from Cellmark Diagnostic, testified regarding various forensic evidence. He testified that tests performed by Cellmark, under his technical supervision, showed that DNA obtained from the semen in the vaginal swab matched the DNA of Parker. Herrin also testified that the semen of McDougal was found on the vaginal swab taken from Morgan's body. In other words, the vaginal swab contained the DNA of both Parker and McDougal.

¶12. Juanita Parker, Parker's sister, testified that he arrived home at approximately 11:30 p.m. on January 25, 1988. She further testified that Parker became ill and threw up in the bathroom and that their mother made him clean it up, and he immediately went to bed. He was still in bed at 6:00 the next morning.

¶13. Kenyata Pace testified that she was at Glenda Faye Owens's house on the night of January 25, 1988, and that Morgan was there. Morgan left the house to look for McDougal. That was the last time that Pace saw Morgan alive. At around 12:00 that same night, McDougal's truck pulled up in front of the house. He was dating Morgan on a regular basis. It sat there for a good five or ten minutes, and then pulled up and backed out of the driveway.

¶14. Morgan's best friend, Tara Bufkin, testified that she had seen Morgan on the night before she was murdered. Morgan told this witness that she was afraid McDougal was going to find her and

beat her up.

¶15. Joe Andrews, a forensic scientist at the Mississippi Crime Lab in Jackson, testified that he examined the red thread found at the scene and compared it with the clothing submitted to him from Parker and determined that they were different in microscopic characteristics and chemical composition. He further testified that he examined the known hair samples of Morgan and hair samples of Parker, and compared them to the hair samples recovered from the cap and determined that they did not exhibit the same microscopic characteristics.

¶16. Bufkin testified that she was playing cards with the victim on the night before her death and had a conversation with her when Morgan told her that she was afraid that Mike McDougal was going to jump on her.

¶17. Ethel Jones testified that she saw McDougal at a local car wash at approximately 5:00 or 5:30 on the morning of January 26, 1988, and that he was washing out the inside of the tail-end of his truck.

### DISCUSSION OF LAW

**I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN THE SELECTION AND COMPOSITION OF THE JURY IN THAT IT (A) FAILED TO QUASH THE SPECIAL VENIRE, AND (B) ALLOWED THE STATE TO CHALLENGE BLACK MEMBERS OF THE PANEL WITHOUT RACIALLY NEUTRAL EXPLANATIONS.**

**II. THE STATE PREJUDICED THE JURY IN ITS CLOSING ARGUMENT BY REFERRING TO MATTERS WHICH THE SUPREME COURT HAD PREVIOUSLY RULED NOT TO BE ADMITTED ON THE RETRIAL OF THIS CASE.**

**III. THE COURT ERRED IN AMENDING DEFENSE INSTRUCTION D-2.**

¶18. We find that all three issues are without merit and affirm the decisions of the lower court below.

**IV. THE COURT ERRED IN ALLOWING THE STATE OF MISSISSIPPI TO CALL JOSEPHINE PARKER ADVERSELY AS A REBUTTAL WITNESS, AND FURTHER COMPOUNDED THE ERROR BY ALLOWING THE STATE THEN TO PRODUCE REBUTTAL WITNESSES TO THEIR OWN REBUTTAL WITNESS.**

¶19. After the State and the defense had rested their cases-in-chief, the State called Josephine Parker, Parker's mother, to the stand for the first time as an adverse witness on rebuttal. The State began cross-examining the witness on direct and Parker's counsel objected. The judge sustained the objection for a moment. Then as the questioning continued, the judge called the attorneys to the bench. After an off-the-record conference was held, the judge overruled the objection by Parker's counsel to Mrs. Parker's testimony. The State continued its direct examination and attempted to impeach its own witness by her prior inconsistent **unsworn** testimony.

¶20. The State was questioning Mrs. Parker about whether Parker had come home with a sticky substance all over himself, and whether she had any conversations with Officer Anderson the next

morning about such things. She continuously denied that she had ever made any such statements. Subsequently, the State called three witnesses to testify as to the oral statements made by Mrs. Parker to them. At the end of all the State's rebuttal testimony, the trial court afforded the defense an opportunity for surrebuttal, which he declined.

¶21. Parker objects to this entire rebuttal on two grounds. First, that Mrs. Parker should have been called during the State's case-in-chief. Second, that it was also erroneous to allow the State to impeach its own witness without showing surprise, and then to allow rebuttal witnesses to the rebuttal witness.

¶22. First, we must determine whether the lower court erred in allowing Mrs. Parker to testify as a rebuttal witness. This Court has held that:

> In the recent case of **Hosford v. State**, 525 So. 2d 789, 792 (Miss. 1988), citing **Roney v. State**, 167 Miss. 827, 150 So. 774 (1933), we held that the State should not withhold evidence for rebuttal which properly belonged as a part of its case-in-chief. It is not always clear, however, whether evidence properly is part of the State's case-in-chief, or rebuttal. **In gray areas, some discretion must be afforded the circuit court, especially when the defendant is offered an opportunity for surrebuttal.** *Breakfield v. State*, 275 So. 2d 860 (Miss. 1973).

*Barnes v. State*, 532 So. 2d 1231, 1234 (Miss. 1988) (emphasis added). This case is a gray one. Did the testimony belong in the State's case-in-chief or rebuttal? Since it is a close call, the circuit court judge is afforded discretion. We cannot hold that the lower court erred in allowing Mrs. Parker to testify, especially because it offered Parker the opportunity for surrebuttal and he declined. Thus, it was not error for Mrs. Parker to testify as a rebuttal witness. However, we must still look to see if the State was erroneous in attempting to impeach its own witness and calling rebuttal witnesses to its rebuttal witness.

¶23. "Courts have not permitted a party to call a disinterested witness, and after eliciting favorable testimony from him, attempt to cross-examine him as to the testimony that is unfavorable." *Wilkins v. State*, 603 So. 2d 309, 318 (Miss. 1992). Regarding this issue, we have held that:

> [B]efore a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness, it will be necessary that he show surprise or unexpected hostility, and that **such statement can never be used as substantive evidence.**"

*Wilkins*, 603 So. 2d at 322 (emphasis added). Under our previous case law, before the State may even attempt to introduce the pretrial inconsistent statements of Mrs. Parker, it must show surprise or unexpected hostility. This was not done by the State in the present case.

¶24. The State argues that it was surprised because there was no indication that Mrs. Parker might testify differently from her pretrial statements. Further, the State argues that "Mrs. Parker was called to the stand because she possessed first hand knowledge of relevant, admissible evidence concerning the time at which her son arrived home on the night of the murder and concerning the condition of her son's clothing upon his return." This statement may support the State's position that it was surprised. However, if this statement is true, then it seems that Mrs. Parker should have been called during the State's case-in-chief since she possessed such important first hand knowledge of some key

evidence. Thus, this statement becomes a double edged sword for the State. If it is true to prove surprise, then it is also true to support Parker's contention that Mrs. Parker should not have been called as a rebuttal witness. The State was not surprised; and it concedes that Mrs. Parker was not unexpectedly hostile. Thus, the State should not have been allowed to impeach its own witness.

¶25. Moreover, even if we were to find that the State did properly impeach its own witness, the out-of-court pretrial unsworn inconsistent statements may not be used as substantive evidence. The sentence quoted above from the State makes it clear that the State intended to use the testimony as substantive evidence and not merely to call Mrs. Parker's credibility into question. Furthermore, a look at the State's closing argument reflects that the State intended Mrs. Parker's out-of-court statements to be used as substantive evidence. On closing, Mr. Turner stated as follows:

> Mr. Kilpatrick said, "Well, there was nothing on his clothes." Well, you know, that's not what Josephine Parker, his own mother, told not only Larry Walker [District Executive Officer of the Meridian District for the Highway Patrol], but also Bobby Anderson, the day the body was found. Remember what they testified to?

> Bobby Anderson said at the police department she caused a ruckus and claimed it couldn't be him, because he came home at night with some sticky sweet smelling stuff on him, and he came home about four o'clock in the morning.

> Larry Walker, when he went out there that same day on a search warrant, Josephine Parker, the Defendant's own mother, told him, "He came in here tracking that shit all over the living room."

> Which is why he was out at the washhouse bright and early at six-thirty the next morning, with those frozen clothes.

Clearly, the State used the impeachment evidence as substantive evidence against Parker and in violation of the previous case law of this State.

¶26. To ensure that the unsworn inconsistent statement is not considered substantive evidence, we have held that:

> under the "unfair prejudice, confusion of the issues, or misleading of the jury" provisions of Rule 403, the circuit judge should consider whether a cautionary instruction to the jury will be sufficient to keep the jury from treating the unsworn pretrial inconsistent statement as substantive evidence, and if not, **the statement should not be introduced.**

*Wilkins*, 603 So. 2d at 322 (emphasis added). No such jury instruction was offered in the present case. Therefore, the statements were erroneously introduced into evidence. The testimonies of Anderson and Walker were erroneously admitted into evidence over the objections of Parker's counsel. And further, no jury instruction was offered to instruct the jury that the rebuttal testimony should not be considered substantive evidence. Thus, the lower court erred in allowing the State to impeach Mrs. Parker's testimony and then use it as substantive evidence. This is a bad practice and when this Court sees it, we are required to reverse. Such a blatant violation of our rules of evidence constitutes reversible error.

## CONCLUSION

¶27. All issues are without merit except for Issue IV. The lower court erroneously allowed the State to call Mrs. Parker as a rebuttal witness and then impeach her with out-of-court pretrial statements. Moreover, it was error to allow the State to use the impeachment testimony as substantive evidence in its closing arguments to the jury. Parker was denied his right to a fair trial. Thus, this case shall be reversed and remanded for proceedings not inconsistent with this opinion.

**¶28. REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., BANKS AND McRAE, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ.**

**SMITH, JUSTICE, DISSENTING:**

¶29. Michael Parker has previously been granted a new trial by this Court due to error concerning an evidentiary matter. ***Parker v. State***, 606 So. 2d 1132 (Miss. 1993). The majority today relies upon ***Wilkins v. State***, 603 So. 2d 309, 318 (Miss. 1992) and once again reverses Parker's case, granting Parker, convicted of capital murder committed during the forcible rape of Rachel Morgan, a third trial. The majority finds a supposed error in the State's examination of Josephine Parker, Michael Parker's mother, who was called as an adverse witness on rebuttal. The majority faults the State for "not showing surprise or unexpected hostility."

¶30. However, an examination of this record is indeed revealing. The majority has engaged in surmise and speculation to arrive at such a drastic conclusion. There is nothing within this record to indicate that the prosecutor was not surprised by Josephine Parker's testimony at trial which was totally contrary to her pretrial statements. The fact that Josephine Parker was the defendant's mother is sufficient reason to suspect that she would be adverse and hostile, thus the State was justified in calling her as an adverse witness. But, there is nothing in the record which indicates that the prosecutor knew in advance of trial or expected that Josephine Parker, when confronted with her prior pretrial statements, would testify inconsistently.

¶31. This Court apparently relied upon an indicia of lack of surprise as the criteria for determining if a party can impeach their own witness. ***Wilkins***, 606 So. 2d at 319. In the case at bar we do not have the same factual situation where the party clearly knew that the witnesses' testimony would be inconsistent, as in ***Wilkins***, ***Cooper v. State Farm Fire & Cas. Co.***, 568 So. 2d at 691; ***Moffett v. State***, 456 So. 2d 714, 719 (Miss. 1984); and ***Hall v. State***, 250 Miss. 253, 263, 165 So. 2d 345, 350 (1964).

¶32. Josephine Parker's inconsistent testimony allowed the prosecutor to impeach her testimony with that of witnesses Anderson, Walker and Harris. The trial court, who was in a much better posture to observe the prosecutor than this Court, properly allowed this impeachment testimony. In ***Barnes v. State***, 532 So. 2d 1231 (Miss. 1988), this Court stated:

> [i]t is not always clear whether evidence properly is part of the State's case-in'chief, or rebuttal. In gray areas, some discretion must be afforded the circuit court, especially when the defendant is offered an opportunity for surrebuttal.

*Barnes*, 532 So. 2d at 1234.

¶33. This is one of those gray areas. Michael Parker had already introduced testimony from his sister and a friend concerning what time they believed that Parker had returned home on the date in question. Thus, the predicate had been laid for Josephine Parker's rebuttal testimony by the State. It is also noteworthy that here, as in *Barnes*, the trial court offered surrebuttal to Parker, but he refused. We should defer to the wisdom of the first hand observation and decision of the trial court. *Wilkins* is absolutely factually distinguished from the case at bar. Parker's conviction for the capital murder committed during the forcible rape of Rachel Morgan should be affirmed.

¶34. I respectfully dissent.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

1. McDougal was a probable suspect. The defense's theory seemed to be that McDougal was the killer and not Parker.