## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2001-KA-00197-SCT

*TIMOTHY MORGAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/15/2000 |
| TRIAL JUDGE: | HON. JOHN T. KITCHENS |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RICHARD FLOOD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | RICHARD D. MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/06/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/27/2002 |

**BEFORE SMITH, P.J., COBB AND DIAZ, JJ.**

**COBB, JUSTICE, FOR THE COURT:**

¶1. On March 15, 2000, Timothy Morgan and Patrick Otto[1] were indicted by the Madison County grand jury on charges of armed robbery. At the conclusion of trial in November, 2000, the jury found Morgan guilty, and he was sentenced to 30 years in the custody of the Department of Corrections. Following denial of his post-trial motion for JNOV, or alternatively, a new trial, Morgan appeals, raising the following issues:

> **I. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO INTRODUCE INTO EVIDENCE A WITNESS STATEMENT WHICH THE WITNESS HAD ALREADY READ TO THE JURY OVER MORGAN'S OBJECTION.**
>
> **II. WHETHER THE TRIAL COURT ERRED WHEN IT LIMITED MORGAN'S INQUIRY INTO THE STATE OF MIND OF WITNESS JIMMIE LEE OLLIE AT THE TIME OF THE ALLEGED OFFENSE.**
>
> **III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO BADGER AND THREATEN WITNESS PATRICK OTTO WITH PROSECUTION FOR PERJURY UNLESS HE CHANGED HIS TESTIMONY.**
>
> **IV. WHETHER THE TRIAL COURT ERRED IN LIMITING MORGAN'S INQUIRY INTO PATRICK OTTO'S STATE OF MIND AT THE TIME OF THE ALLEGED OFFENSE AND HIS CREDIBILITY AND BIAS AS A RESULT OF HIS PLEA BARGAINS IN OTHER CASES.**

**V. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO BRING PATRICK OTTO INTO THE PRESENCE OF THE JURY IN CHAINS AND PRISON ATTIRE.**

**VI. WHETHER THE TRIAL COURT COMMITTED PLAIN ERROR.**

¶2. Concluding that Morgan's assignments of error are without merit, we affirm.

## FACTS

¶3. On June 24, 1999, Roy Giles visited the home of Jimmy Lee Ollie in Canton, Mississippi. Giles had received his weekly paycheck earlier that day and had $120 on his person. Present at the house were Ollie, Tim Morgan, Patrick Otto and a woman named Ann Johnson. A few minutes later, Ollie left the house, and Morgan and Otto took the opportunity to rob Giles at gunpoint and take his wallet. Morgan and Otto then left the Ollie residence, and when Giles returned to his home, he called the Canton police, giving a statement identifying Morgan and Otto. Giles later identified Morgan from a group of photographs. At trial, Giles again identified Morgan as one of his robbers. On cross-examination, Morgan's attorney asked Giles about a second statement later given to the police in order to highlight inconsistencies between the two statements. In the course of this cross-examination, Giles revealed that he also identified Morgan out of a photographic lineup, and Morgan then moved for a mistrial, arguing that Giles's reference to Morgan's police mug shots was the equivalent of revealing his prior arrests to the jury. The trial court noted that Giles never actually said the photos were mug shots nor did he otherwise suggest that Morgan had been arrested previously, and the motion was overruled. During redirect, the State also questioned Giles about the second statement and then offered the statement into evidence over Morgan's objections.

¶4. Next, the State called Jimmy Lee Ollie who testified that Giles, Morgan and Otto were all in his house when he left, that he saw Morgan and Otto running from his home as he returned, and that Giles came out shortly thereafter and told him that Morgan and Otto had robbed him. Ollie also denied drinking or taking drugs at the time of the incident.

¶5. Finally, the State called Patrick Otto who had previously pled guilty to charges of robbing Giles, as well as to an unrelated manslaughter. Otto initially denied that Morgan was involved. The trial court then instructed Otto on the penalty for perjury outside the presence of the jury. However, Morgan complained that the State should not be allowed to badger Otto outside the jury's presence, and so the jury was brought back into the courtroom. The State vigorously questioned Otto about statements he made to the prosecution in a nearby waiting room shortly before beginning his testimony, and Otto eventually testified that "he [Morgan] pulled a pistol, and I got the money." On cross-examination, Otto testified that he could not remember whether he had anything to drink on the day in question or had taken any narcotics.

¶6. Following Otto's testimony, the State rested. Morgan also rested without testifying or calling any witnesses.

## DISCUSSION

**I. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO INTRODUCE INTO EVIDENCE A WITNESS STATEMENT WHICH THE WITNESS HAD ALREADY READ TO THE JURY OVER MORGAN'S OBJECTION.**

¶7. Morgan first argues that the State should not have been able to offer Giles's two statements made to the police. Morgan relies on *Gardner v. State*, 455 So.2d 796, 800 (Miss. 1984), in which we held that a witness could read to a jury from notes used to refresh his memory. Morgan interprets *Gardner* to mean that Giles could only have read the two statements but they could not have been admitted as evidence, although no such language appears in *Gardner*. The State, for its part, argues that this issue is without merit since Morgan only raised a general objection which is not properly preserved on appeal. Morgan replies that failure to preserve an objection with specificity does not waive the objection where the reason for the objection is obvious from the record.

¶8. We conclude that *Gardner* does not stand for the proposition that statements used to refresh memory are per se inadmissible in their own right. Furthermore, we perceive no basis for challenging the admission of the statements at all except perhaps hearsay. Mississippi Rule of Evidence 801(d)(1) governs prior statements by a witness and states in relevant part:

> A statement is not hearsay if:

> (1) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . .

Miss. R. Evid. 801(d)(1). In *Conley v. State*, 790 So.2d 773, 788 (Miss. 2001), we upheld the admission of an unsworn statement made by a witness to an insurance investigator where that witness had been accused by defense counsel of recent fabrication during cross-examination.

¶9. The record reflects that information about Giles's two statements to police was first elicited by Morgan during his cross-examination of Giles. Morgan also attempted to highlight inconsistencies between Giles's trial testimony and the two statements such as the identity of Ann Johnson and whether Morgan and Otto both had guns or only one did, and at one point Morgan's attorney asked Giles if he was lying earlier or lying now.

¶10. Because Morgan opened the door to admission of the two prior statements by cross-examining Giles about them and accusing Giles of lying in them, this issue is without merit.

### II. WHETHER THE TRIAL COURT ERRED WHEN IT LIMITED MORGAN'S INQUIRY INTO THE STATE OF MIND OF WITNESS JIMMIE LEE OLLIE AT THE TIME OF THE ALLEGED OFFENSE.

¶11. Morgan next argues that the trial court erred in not allowing him to cross-examine Jimmie Lee Ollie more fully about alleged drug use, as well as whether there was any sort of immunity agreement between Ollie and the State in exchange for Ollie's testimony. At trial, Morgan was allowed to ask Ollie if he had been drinking or "smoking any dope" on the day of the robbery, and Ollie answered both questions in the negative. Later, outside the jury's presence, the following exchange occurred:

> MR. FLOOD [attorney for Morgan]: Before you bring the jury back in, during the examination of Jimmy Lee Ollie, I asked him a line of questions going to what I consider the state of mind and credibility of Jimmy Lee Ollie. He is a confessed drug seller, a confessed cocaine user. His property has never been forfeited or seized. We think that the jury should have that type of information to consider in his credibility.

THE COURT: Jimmy Lee Ollie didn't confess on the witness stand to any of those things. What evidence do you have, Mr. Flood?

MR. FLOOD: Well, I wasn't allowed to ask him the questions as to whether he was using cocaine that day.

THE COURT: There was an objection about-- you didn't ask him any questions about cocaine. You asked if he had been smoking any dope.

MR. FLOOD: Yes, sir, and they objected.

THE COURT: In Madison County, I have been in this business long enough to know smoking dope means marijuana. I didn't think it was relevant. This guy is not on trial. He's just a witness to what happened. He wasn't an eye witness. He was a witness to people leaving the scene. I didn't think it was relevant. I thought it was overly prejudicial. So I sustained the objection.

MR. FLOOD: But the line of questions was going to his state of mind at the time having been on drugs and his credibility as a witness.

THE COURT: I think there's a distinct difference in his credibility as a witness and his state of mind. I don't think state of mind has anything to do with this. This person denied using any drugs that day, and was outside his home when, from his testimony, allegedly two people ran out the back door and saw him. That's the basis of his testimony. So I don't see how, even if he had smoked any dope that day it would have any bearing on whether or not he could testify as to the two people he saw run out of his house. He knew they were in there because he was in there with them three hours before. Overruled.

MR. EMFINGER: [attorney for the State] Well, your Honor, my memory was he did answer the questions as to whether or not he had been smoking anything and smoking dope. I thought he did answer.

THE COURT: He said no.

MR. EMFINGER: But in any event, your Honor, this is like anything else before. You can [sic] just sit here and hammer a witness on the stand, you got to have a reasonable basis for asking that question.

THE COURT: Does he have prior convictions, Mr. Flood, for cocaine possession and cocaine selling?

MR. FLOOD: That's exactly the point. He has never been arrested. Although on that very witness stand, he has confessed to selling dope out of his front door -

THE COURT: Today?

MR. FLOOD: Not today, in the past.

¶12. Morgan offered no evidence to support his allegations that Ollie was still a drug user at the time of the robbery. Also, as the trial court noted, Morgan did not actually ask Ollie anything about cocaine use at the time of the robbery, asking instead about drinking and smoking dope. While an argument could be made

that Morgan was talking about smoking crack cocaine when he asked if Ollie had smoked any dope on the day of the robbery, we defer to the trial court's evaluation and rule this issue waived as being improperly preserved. The issue of whether Morgan was entitled to explore Ollie's having received leniency in exchange for his testimony is more fully discussed in Issue IV, infra.

### III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO BADGER AND THREATEN WITNESS PATRICK OTTO WITH PROSECUTION FOR PERJURY UNLESS HE CHANGED HIS TESTIMONY.

¶13. On this issue, Morgan points to the following exchanges from his trial during the testimony of Patrick Otto:

[MR. SAVANT: attorney for the State] Q. Patrick, you're in jail now, correct?

[PATRICK OTTO] A. Yes, sir.

Q. You have, in fact, pled guilty to armed robbery and manslaughter, correct?

A. Yes, sir.

Q. Was that armed robbery, was that the robbery where y'all took the money from Roy Giles?

A. I took money.

Q. Who was with you?

A. I did it by myself.

Q. Was Timothy Morgan with you?

A. I don't know nothing about him.

Q. Do you know Timothy Morgan?

A. Yeah, I know him. When I see him, I know him.

Q. Do you see him today?

A. No, I ain't -- now I see him.

Q. Is that him sitting at the table by Mr. Flood?

A. Yeah.

Q. And Patrick, you remember when you pled guilty to this armed robbery?

A. Yes, sir.

Q. You remember when you stood in this courtroom and told the Judge that you and Timothy Morgan pulled guns on Roy Giles?

MR. FLOOD: We're going to object, your Honor.

THE COURT: Overruled.

A. No, that wasn't it. The Judge, he read like that. He said I robbed Roy Giles at pistol point.

Q. (Mr. Savant, Continuing) Do you remember telling the Judge in this courtroom that you and Timothy Morgan pulled a gun on Roy Giles?

A. I ain't never mentioned it to the Judge.

MR. EMFINGER: Your Honor, we would ask that the jury be excused so that the witness can be properly instructed.

THE COURT: Excuse the jury.

(JURY OUT)

MR. EMFINGER: Your Honor, I'd like to instruct Mr. Otto on the record that, if the court please, his counsel is not here. Those matters have been terminated. I would like for the court to instruct Mr. Otto, and we have just conversed with Mr. Otto, that his cases were closed. And as we spoke with him back there, he gave us statements that were in conformity with his guilty plea. And at this point, he is under oath, and I believe he needs to be advised of the charge of perjury and the additional time that he could be charged with perjury based on his testimony today being different from his guilty plea testimony.

THE COURT: All right, Patrick, you understand that you gave certain testimony in your guilty plea under oath. You talked to these prosecutors today. You've indicated in the record that you had intended to testify that you and Timothy Morgan did commit this armed robbery. You are under oath today, and testified opposite to those past two times. The penalty for perjury in this state is ten years. I want to advise you that you can be investigated by the grand jury and charged with perjury if your testimony is, in fact, perjury. You understand that?

THE WITNESS: Yes.

THE COURT: You don't have any Fifth Amendment right as to silence because you have been convicted of this crime, the armed robbery and the manslaughter. So I'm instructing you, Patrick, that perjury carries a ten-year penalty and that you are under oath, and you must give truthful testimony. Do you understand?

THE WITNESS: Yes, sir.

MR. EMFINGER: Your Honor, with that in mind outside of the presence of the jury, could I voir dire the witness.

THE COURT: You may.

MR. FLOOD: Your Honor, we're going to object to this.

THE COURT: Overruled. The jury is not in here.

MR. FLOOD: If they want to question the witness in the presence of the jury, we think that's fine. But to come in here and badger this witness about his testimony right now -

MR. EMFINGER: I got no problem doing it in front of the jury.

THE COURT: Bring the jury in.

(JURY IN)

THE COURT: All right, you may proceed.

Q. (Mr. Savant, Continuing) Mr. Otto, you are under oath here today. You understand that, don't you?

A. Yes, sir.

Q. You have taken a sworn oath. You understand?

A. I don't know what that is.

Q. Did you place your hand on the Bible and raise your right hand and take an oath prior to taking this witness stand?

A. Yes, sir.

Q. And you are familiar with the charge of perjury and what sentence that brings, correct?

A. No, sir.

Q. Were you just informed that by the court?

MR. FLOOD: Your Honor, we're going to object to leading questions here.

THE COURT: Overruled.

Q. (Mr. Savant, Continuing) Mr. Otto, were you just informed by the court as to what the charge of perjury is and what kind of sentence that brings?

A. Yes, sir.

Q. A ten-year sentence in prison, correct?

A. Yes, sir.

Q. And didn't you, prior to getting on the witness stand, tell me and Mr. Emfinger that you were present when Timothy Morgan robbed Roy Giles? Didn't you tell us that?

A. (NO RESPONSE).

Q. Mr. Otto?

A. Sir?

Q. Did you not tell me and Mr. John Emfinger back there in that holding cell that you were present when this man put a gun in Roy Giles' face and took his money? Did you not tell us that?

A. I was there.

Q. And did you not tell us that Timothy Morgan put a gun in his face? Ten minutes ago in that holding cell, didn't you tell us that?

MR. FLOOD: Objection, your Honor -

A. He had a gun, but I got the money.

MR. FLOOD: He's not allowing the witness to answer the question.

THE COURT: Overruled. Let him answer the question.

Q. (Mr. Savant, Continuing) What was your answer?

A. He had a gun, and I got the money.

Q. What did he do with that gun?

A. He pulled a gun out.

Q. Put it in Roy Giles' face, correct?

A. I don't know. He had the gun and I got the money out of his pocket.

Q. Mr. Otto, again, you are under oath. You know about the charge of perjury. Do you not remember ten minutes ago in that holding cell telling me and Mr. John Emfinger that Timothy Morgan -

MR. FLOOD: Your Honor, we are going to object to this whole line of testimony at this point. He has gone over this three or four times.

THE COURT: Mr. Flood, I don't know if he got a clear answer, so I'm

going to let him ask it one more time and that's it.

Overruled.

Q. (Mr. Savant, Continuing) Mr. Otto, ten minutes ago when you spoke with me and Mr. Emfinger in that holding cell back there, did you not tell us that Timothy Morgan had put a gun in Roy Giles' face and you took his money; is that correct?

A. He pulled a pistol, and I got the money.

Q. You got the money?

MR. SAVANT: That's all I have, your Honor.

¶14. Morgan argues that the State improperly badgered Otto into changing his testimony, relying on our holdings in *Toney v. State*, 298 So.2d 716 (Miss. 1974), *Morgan v. State*, 388 So.2d 495 (Miss. 1980) and *Parker v. State*, 691 So.2d 409 (Miss. 1997). In *Toney*, the defendant sought a continuance on the day before trial due to the absence of two witnesses. *Toney*, 298 So.2d at 719. The motion was denied, and when trial began the next day, Toney's witnesses were present. During cross-examination, the prosecution sought to bring out the fact that one of the witnesses had fled the county after the crime occurred and insinuated that some of Toney's witnesses had perjured themselves during the hearing on the motion for continuance. We reversed Toney's conviction, holding that the prosecution's tactics were improper and prejudicial. *Id.*

¶15. In *Morgan*, the prosecution asked the defendant if he recalled making an incriminating statement in an earlier trial. *Morgan*, 388 So.2d at 497. Over defense objections, the prosecution repeatedly asked Morgan about alleged changes in his testimony since his first trial, and on redirect, Morgan introduced the entire transcript of the previous trial in order to prove that no such changes occurred. *Id.* We later held this to be error. *Id.*

¶16. Finally, in *Parker*, the prosecution called the defendant's mother as a rebuttal witness after conclusion of the defense case-in-chief. *Parker*, 691 So.2d at 412. The mother was then impeached by the State with her own prior and unsworn statements, and the State was eventually allowed to call rebuttal witnesses to its own rebuttal witness. We reversed, concluding that the State must show both surprise and unexpected hostility before it can use an unsworn pretrial statement for impeachment. If the State had truly not expected hostility from the defendant's mother, then it should have called her during its case-in-chief rather than as a rebuttal witness. We also noted that "[b]efore a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness, it will be necessary that he show surprise or unexpected hostility, and that such statement can never be used as substantive evidence." *Id.* at 413 (quoting *Wilkins v. State*, 603 So.2d 309, 318 (Miss. 1992)). *See also* Miss. R. Evid. 801(d)(1) cmt. (noting that prior inconsistent statements are admissible for impeachment but not as substantive evidence unless statement was taken under oath).

¶17. *Toney, Morgan,* and *Parker* are all distinguishable from the case at bar. Patrick Otto was not a rebuttal witness or a defense witness. He was called by the State during its case-in-chief and the record clearly reflects that the surprise and unexpected hostility requirements were met. While the *Toney* prosecutors insinuated that witnesses perjured themselves in a separate proceeding, the State here suggested that Otto had committed perjury through the testimony he just gave. Further, the prior statements were not offered for substantive evidence, since Otto eventually gave testimony in agreement with the prior statements. Thus, the fact that the statements were unsworn is irrelevant. This issue is without merit.

### IV. WHETHER THE TRIAL COURT ERRED IN LIMITING MORGAN'S INQUIRY INTO PATRICK OTTO'S STATE OF MIND AT THE TIME OF THE ALLEGED OFFENSE AND HIS CREDIBILITY AND BIAS AS A RESULT OF HIS PLEA BARGAINS IN OTHER CASES.

¶18. Morgan next argues that the trial court committed reversible error by restricting his cross-examination of Patrick Otto, concerning Jimmy Lee Ollie's residence being used as a crack house, to show Otto's state of mind and Otto's bias because of an alleged plea bargain with the State. Morgan later proffered the "essence" of both of these lines of questioning in chambers after the State rested.

*A. Residence being used as a crack house and Otto's state of mind.*

¶19. In his brief, Morgan alleges that he was prevented from attempting to establish that Ollie's residence was a crack house and that Ollie has not been prosecuted for any drug offenses, neither has his property been forfeited. However, we fail to see how Ollie not being prosecuted demonstrates Otto's state of mind. Also, in examining the first proffer made in chambers, it is clear that Morgan is claiming he was prevented from questioning Otto about being under the influence of drugs, which affected his perception. In chambers, this exchange took place:

MR. FLOOD: We also want to make two proffers. On my line of questioning on Mr. Patrick Otto about drugs, that was cut off. We think that he was under the influence of drugs, and they were all using drugs there at that time. That would go to credibility and ability to remember. As you recall, he repeatedly said he didn't remember very much other than his simple statements.

THE COURT: You asked Mr. Otto was he using drugs?

MR. EMFINGER: He said he didn't recall.

THE COURT: But I don't think anybody - - did they object?

MR. FLOOD: I think they did. But if they didn't, then I just want to make sure.

¶20. A review of the transcript indicates that defense counsel asked Otto whether he had been drinking, whether he had anything to smoke, and had he been using any kind of narcotics. To all three questions, Otto responded that he could not remember. The State did not object to any of these questions.

¶21. As the record indicates, Morgan was not prevented from questioning Otto about his drug use, and his attorney was apparently confused later in chambers when he made this proffer. This issue is without merit.

*B. Bias because of a possible plea bargain.*

¶22. During cross-examination of Patrick Otto by Morgan's counsel, the following exchange took place:

[Mr. Flood]

You also pled guilty to manslaughter, didn't you?

Yes, sir.

That was reduced from capital murder, wasn't it?

a. That hadn't got anything to do with this here.

Q. You pled guilty to manslaughter, didn't you?

A. (NO RESPONSE).

MR. FLOOD: Your Honor, would you instruct him to answer the question.

THE COURT: Answer the question, Patrick.

Q. (Mr. Flood, Continuing) And you were charged with capital murder in that indictment, weren't you?

A. Yes, sir.

Q. And capital murder carries with it the death penalty?

MR. SAVANT: Objection.

THE COURT: Sustained.

Q. (Mr. Flood, Continuing) So when the deal gets good enough, you'll say whatever - -

MR. SAVANT: Objection.

THE COURT: Sustained. Mr. Flood.

A. If it was a deal, I would be free.

THE COURT: Hold on, Patrick. Mr. Flood, move on.

¶23. Flood then pursued another line of questioning. Later in chambers, he asked to make his second proffer, as follows:

Mr. Flood: . . . And another on plea bargain concerning the death penalty for capital murder, and any penalty that reduction he got from capital murder, manslaughter, we would offer in evidence and continue that line of testimony.

¶24. Morgan argues that he had a fundamental right for the jury to know what punishment Otto had escaped when the State allowed him to plead guilty to his involvement in the robbery of Giles, as well as the capital murder offense based on an unrelated incident.

¶25. In *Suan v. State*, 511 So.2d 144, 148 (Miss. 1987), we reversed a conviction, holding that criminal defendants were entitled to show that prosecution witnesses had been involved in criminal activity but had not been prosecuted. Our reasoning was that such impeachment was permissible not to attack the credibility of the witness but to show a possible bias. In *Suan*, we stated:

> Here the defense sought to show that Eddie Grammar had been involved in criminal activity but had not been prosecuted. The point was that Grammar's neck was on the line if he did not testify in a manner pleasing to the prosecution. This Suan was entitled to show - or at least to attempt to show.

*Suan,* 511 So.2d at 148. However, in *Craft v. State*, 656 So.2d 1156, 1163 (Miss. 1995) we stated:

> "The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." The record does not indicate that the trial court improperly denied the defendant his right to impeach Troy through limiting Zenobia's testimony, especially since her proffered testimony indicated that she was not going to tell of any favorable treatment Troy might have received. Therefore, the trial court is affirmed in its ruling on this issue as it did not abuse its discretion in this area.

(citations omitted).

¶26. Even if it was an attempt to show bias, the first objection could have been correctly sustained on the basis of badgering the witness or being argumentative. Otto had already stated that his plea to manslaughter had nothing to do with this case. Similarly, Flood was badgering the witness when he asked/stated the following: "So when the deal gets good enough, you'll say whatever - -," and the Court again sustained the State's objection. Regardless, Otto denied for a second time that there was a deal. Flood then pursued another line of questioning. In sum, the record does not indicate that Flood was prevented from asking questions about the bias, if that is the "essence" of his proffer. He clearly was allowed to do so, and Otto twice denied that the manslaughter plea was the result of a deal. As in *Craft*, even if it was true that Otto had received some favorable treatment, he was not going to reveal it. We find the judge did not abuse his discretion or commit reversible error in sustaining the objections.

### V. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO BRING PATRICK OTTO INTO THE PRESENCE OF THE JURY IN CHAINS AND PRISON ATTIRE.

¶27. In *Buckley v. State*, 772 So.2d 1059, 1062 (Miss. 2000), we held that when a defense witness is brought into the courtroom in restraints, "where there is no record that the jury saw the restraints or where the restraints were quickly removed such is harmless error." Morgan makes much of the fact that the State specifically referred to the fact that Patrick Otto was brought into the courtroom in shackles during its closing argument. However, any additional prejudice is offset by the fact that Otto was *the State's witness*. Our prior case law dealing with prejudice arising from a witness led into a courtroom or otherwise observed by jurors in chains have all dealt with cases in which either the defendant himself or a prominent defense witness is the one chained. Morgan cites no authority for the proposition that a defendant is prejudiced by the fact that a prosecution witness is brought in wearing chains. This issue is without merit.

### VI. WHETHER THE TRIAL COURT COMMITTED PLAIN ERROR.

¶28. Finally, Morgan argues that two additional issues may be considered by this Court under the plain error doctrine even though they are not properly preserved in the record. First, Morgan argues that he was entitled to a mistrial due to Roy Giles's blurting out (in response to a defense question) that he had picked Morgan out of a photographic lineup. Morgan argues that this was an improper reference to prior bad acts, and he insinuates that the State deliberately coached Giles to make that statement. This assignment of error is based on the following exchange as defense counsel was cross-examining Giles:

[MR. FLOOD]: Correct. Do you remember making that statement?

[GILES]. Yes. I had to go, and he showed me a bunch of photographs and pictures and things of different ones. You could pick out the person.

MR. FLOOD: Your Honor, would you excuse the jury?

THE COURT: Take the jury out.

(JURY OUT)

MR. FLOOD: Your Honor, the question was did you give a second statement to police. And then

Mr. Giles goes into he starts showing me pictures. That has nothing to do with the statement. And the police officers showing him some pictures is a direct reference to photographs which would be mug shots. And we move for a mistrial based on Mr. Giles' unsolicited testimony, putting prior bad acts in front of the jury.

THE COURT: What does the State say?

MR. SAVANT: Your Honor, first of all Mr. Flood asked the question. Secondly, Mr. Giles testified on direct examination that he had seen Timothy Morgan and Patrick Otto before.

THE COURT: I don't think he's contesting the identification. I think what he's doing is he's bringing the prior bad acts -

MR. SAVANT: He said they were shown some pictures, and he didn't refer to them as mug shots. And Mr. Flood asked the question.

THE COURT: This happens quite often in these criminal trials. He didn't say mug shots. He didn't say anything about a prior conviction. He didn't say anything about any prior bad acts. So your motion will be overruled. But if you keep on in this particular line, it may open the door.

¶29. In his brief, Morgan asserts that "[t]his district attorney has a habit of frequently using the 'blurt out' technique," and insinuates that Giles had been coached to "blurt out" the statement about "a bunch of photographs and pictures and things of different ones." He then cites and relies on *Campbell v. State*, 750 So.2d 1280 (Miss. Ct. App. 1999) to support that proposition, but his reliance is misplaced. In *Campbell*, the Court of Appeals reversed a drug conviction where police officers testifying for the State repeatedly made reference through unresponsive statements to a separate drug sale unrelated to the one for which Campbell was being tried. In the case sub judice, however, Morgan points to only a single instance where a witness even arguably infers any prior bad acts, Roy Giles's reference to the fact that the police had pictures of Morgan and others, which they showed to him. In the trial court's view, that reference was not sufficient for jurors to conclude that Giles meant police mug shots, and we agree.

¶30. Second, Morgan argues that the following statements from the State's closing argument are plain error:

[MR. SAVANT]: Ann Johnson[(2)] wasn't here. Mr. Giles tried to find Ann Johnson. The State wanted her here. And Mr. Flood knows what Ann Johnson would have said if she had been here because she is an eye witness just like Roy Giles.

MR. FLOOD: Your Honor, I'm going to object. The State doesn't know anything about Ann Johnson.

THE COURT: Overruled.

(Mr. Savant, Continuing): No evidence Mr. Flood tried to find her, Timothy Morgan tried to find Ann Johnson.

¶31. Morgan's counsel began his closing argument by focusing on Ann Johnson's absence. Thus it is logical that the State responded in rebuttal closing, as quoted above. Morgan argues that this was an improper argument, as both the State and Morgan theoretically had the opportunity to call Johnson as a witness. In

*Madlock v. State*, 440 So.2d 315, 317 (Miss. 1983), the prosecutor during closing arguments in a murder trial made much of Madlock's failure to call the decedent's wife who could have testified as to whether the decedent had threatened Madlock as he had claimed. We reversed, holding that "particularly in criminal law, the failure to call a witness equally accessible to both the defendant and the state is not a proper subject for comment by either party." *Id.* at 318.

¶32. We conclude that the case sub judice is clearly distinguishable because here, the offending comments were made during the State's rebuttal in direct response to Morgan's comments about *the State's* refusal to call Ann Johnson as a witness. Therefore, the prejudicial effect, if any, certainly does not rise to the level of plain error, and we hold that the State is permitted to respond to direct statements that it did not call a particular witness, by pointing out that the defendant did not either.

## CONCLUSION

¶33. Because none of Morgan's assignments of error require reversal, we affirm the judgment of the Madison County Circuit Court.

¶34. **CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT IS GIVEN CREDIT FOR TIME SERVED.**

**PITTMAN, C.J., SMITH, P.J., WALLER, DIAZ, EASLEY, CARLSON, AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY.**

1. Otto later pled guilty to the armed robbery and to an unrelated manslaughter charge and eventually testified against Morgan.

2. Ann Johnson was one of the group gathered at Ollie's house the afternoon that the crime occurred. Giles testified that he was talking to her when the gun was put in his face.