952 So.2d 225 (2006)
Deric BAILEY, Appellant
v.
STATE of Mississippi, Appellee.
No. 2004-KA-01560-COA.
Court of Appeals of Mississippi.
May 16, 2006.
Rehearing Denied November 7, 2006.
*229 Thomas M. Fortner, Jackson, Lynn Watkins, attorneys for appellant.
Office of the Attorney General by Scott Stuart, attorney for appellee.
Before MYERS, P.J., BARNES and ISHEE, JJ.
BARNES, J., for the Court.
¶ 1. Deric Bailey was convicted in the Circuit Court of the First Judicial District of Hinds County of the murder of Thomas Ryan Evans, and received a sentence of life in prison. From his conviction, Bailey timely appealed to this Court, asserting a number of errors. Finding that the trial court committed reversible error when it allowed a prior, unsworn statement by James Pickens to be considered by the jury as substantive evidence, we are compelled to reverse and remand.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. On the evening of October 24, 2001, Deric Bailey shot and killed Thomas Ryan Evans in the parking lot of the Short Stop Grocery on Lynch Street in Jackson. In May of 2002, Bailey was arrested in connection with the shooting, and was subsequently indicted on a charge of murder. Bailey stood trial in the Circuit Court of the First Judicial District of Hinds County, and on May 13, 2004, was found guilty of murder and sentenced to life in the custody of the Mississippi Department of Corrections.
¶ 3. At trial, the prosecution introduced into evidence a statement that Bailey gave to the Jackson Police Department on the night of his arrest. In the statement, Bailey claimed that, on October 24, 2001, he and his "partner," Fred Braddock, had ridden around town for four to five hours, finally stopping at a liquor store on Lynch Street. Bailey claimed that he walked across the street to the Short Stop Grocery while Braddock was in the liquor store, and that as he approached the store, Evans drove up in a truck and asked Bailey *230 to "serve him up," meaning to purchase marijuana or cocaine. Bailey stated that when he shook his head so as to tell Evans "no," Evans began cursing him, saying, "F____ you, n____." Bailey said that he ignored Evans and went inside the store to purchase a cup of ice, but that when he exited the store he was again accosted by Evans, who once more demanded that Bailey sell him drugs. At this point, according to Bailey's statement, he told Evans, "No, I don't do that," and walked in the direction of Braddock's vehicle, which was parked across the street from the Short Stop Grocery. Bailey stated that at this point, Evans got back in his truck, again said "F____ you, n____," and pointed a gun in Bailey's direction. Bailey claimed that he then reached into his back pocket, pulled his .32 caliber handgun, and shot Evans through the driver's side window of Evans's truck. He stated that after the shooting, Evans's gun fell to the ground, and that he picked it up, fearful that Evans would pick the gun up and "shoot [him] in the back of the head." Bailey stated that immediately after the shooting, he began walking north on Corinth Street, and that he was joined by James Pickens, who arrived at the scene soon after the shooting. As for the guns, Bailey stated that he sold Evans's gun to "a guy that hangs out in [Bailey's] neighborhood," whose name he did not know, and that he disposed of his own weapon by throwing it into the Pearl River the day after the shooting.
¶ 4. The prosecution produced a number of witnesses to contradict Bailey's story. Billy Donerson testified that he had been working in an auto shop directly across the street from the Short Stop Grocery at the time of the shooting, and that he began observing the crime scene immediately after hearing the gunshot. Donerson stated that he watched two men run from the scene, and added that at no point did he see either man approach the truck or pick up any object from the ground. Jonathan Crawford, a police officer who responded to the scene on the night of the shooting, testified that when he arrived at the Short Stop Grocery, he found Evans locked inside his truck with the doors locked, and had to break the window to gain access to Evans. This testimony, taken together with Donerson's testimony that no one approached Evans's truck to open or close the doors or windows until Officer Crawford arrived on the scene, called Bailey's story into doubt. Furthermore, in a statement given to police, Pickens said that he had been with Bailey at the time of the shooting, and that the door to Evans's truck had been closed when Bailey fired the fatal shot.[1] Pickens also told police that he did not see Evans point a pistol at Bailey, and that he did not see Bailey pick up the gun that Evans allegedly dropped after being shot. Also called by the prosecution in its case-in-chief was David Whitehead, an employee of the Mississippi Crime Laboratory admitted by the trial court as an expert in the field of gunshot residue analysis. Whitehead testified that gunshot residue could be expected to be found on Evans's hands had he handled a gun within the four hours preceding his death. However, Whitehead testified that his tests found Evans's hands to be free of gunshot residue, thus leading to his conclusion that Evans had not handled a gun within the four hours preceding his death.[2]
*231 ¶ 5. After opting not to testify or to present any other evidence in his case-in-chief, Bailey was convicted and sentenced to a term of life in the custody of the Mississippi Department of Corrections. Bailey's motion for judgment notwithstanding the verdict, or, in the alternative, a new trial, was denied by the trial court. Aggrieved, Bailey timely appealed to this Court asserting a number of errors. We shall address each in turn.

ISSUES AND ANALYSIS
I. WHETHER PROSECUTORIAL MISCONDUCT DEPRIVED BAILEY OF THE RIGHT TO A FAIR TRIAL.
¶ 6. While acknowledging the wide latitude given counsel in making closing arguments, Bailey contends that the prosecution stepped so far beyond the boundaries of proper closing as to deny him a fair trial. He first alleges that the trial court allowed the prosecution, in closing, to improperly define "heat of passion." Secondly, Bailey contends that the trial court erred in allowing the prosecution to instruct the jurors that the only way they could find Bailey guilty of the lesser-included offense of manslaughter was "if y'all are tired and you're hungry and you're ready to go home." Third, Bailey claims that, in closing, the prosecution deliberately misrepresented testimony by gunshot residue expert David Whitehead. Lastly, Bailey asserts that the trial court erred in denying his motion for mistrial, which was based upon comments by the prosecution which Bailey claims accused his attorney of subornation of perjury.

STANDARD OF REVIEW
¶ 7. Attorneys are allowed wide latitude in arguing their cases to the jury; however, prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. Sheppard v. State, 777 So.2d 659, 661(¶ 7) (Miss.2000). The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is, "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." Id. Furthermore, in closing, counsel "cannot . . . state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudice of men by injecting prejudices not contained in some source of the evidence." Id. (citing Nelms & Blum Co. v. Fink, 159 Miss. 372, 383, 131 So. 817, 821 (1930)).
A. Whether the trial court erred in allowing the prosecution to improperly define "heat of passion."
¶ 8. In beseeching the jury to reach a verdict of murder rather than manslaughter, the prosecution stated the following in its closing argument:
Is this a manslaughter. No. [Defense counsel] talked about everything else, and in the last 10 seconds, oh, and if you don't think it's murder, it's heat of passion.
What is heat of passion. In law school I learned this is what heat of passion is. If you're married and you go in and you see your spouse in the bed with another person, you get mad. You don't have a weapon on you but you reach for the gun that's on the dresser and you shoot the lover. That is heat of passion. That is classic heat of passion.
*232 ¶ 9. While Bailey asserts that this argument was improper, he failed to make a timely objection to the prosecutor's statements. We find no need to pass on the merits of his claim, as this issue is not properly before this Court. See Byrom v. State, 863 So.2d 836, 872 (¶ 119) (Miss. 2003).
B. Whether the trial court erroneously overruled Bailey's objection to the prosecution's statement that the only way jurors could find Bailey guilty of manslaughter was "if y'all are tired and you're hungry and you're ready to go home."
¶ 10. We agree with Bailey that the prosecutor's statement that "[t]he only way you get to heat of passion is y'all are tired and you're hungry and you're ready to go home" was improper. The purpose of the statement was to prejudice Bailey's defense, and had nothing to do with the evidence presented at trial or any reasonable inferences therefrom. See Sheppard, 777 So.2d at 661-62(¶ 9). However, keeping in mind the strength of the evidence against Bailey, we are unable to find that the natural and probable effect of the prosecutor's statement was to create such prejudice against Bailey as to result in a decision influenced by the prejudice so created.
¶ 11. Bailey contends that the prosecutor's statement in the case sub judice is "perilously close" to a statement found by the Mississippi Supreme Court in Sheppard as constituting reversible error. In that case, in closing, the prosecutor stated that if the jury voted to acquit, he wanted the jurors to call him and explain the rationale of finding the defense witnesses credible, so he could explain to the victim's family. Id. at 661(¶ 6). The supreme court held that the natural and probable effect of the statement was "the creation in the minds of the jurors of an extra-legal burden of accountability to the State prejudicial to the rights of the accused." Id. at 662(¶ 10). However, in the present case, the statement made by the prosecutor created no such extra-legal burden of accountability to the State. This issue is without merit.
C. Whether the trial court erred in allowing the prosecutor's closing argument that the absence of gunshot residue on Evans's hands meant he had not handled a gun in the four hours preceding his death.
¶ 12. On direct examination by the prosecution, Mississippi Crime Laboratory employee David Whitehead, qualified by the trial court as an expert in gunshot residue analysis, testified that he "had no evidence to indicate that [Evans's] hands were in the environment of a discharged weapon." However, Bailey's statement did not suggest that Evans had actually fired a weapon. In response, defense counsel, on cross-examination, elicited the following from Mr. Whitehead:
Q: Mr. Whitehead, I believe you testified that the effective time to find gunshot residue on a person is normally about four hours?
A: On a living individual, yes, sir.
Q: So that would indicate that Thomas Ryan Evans did not fire a gun within four hours of the time he was shot?
A: Yes, sir.
Q: That doesn't mean he didn't have a gun in his hand or didn't handle a gun that day, does it?

A: No, sir.
(Emphasis added).
¶ 13. However, on redirect by the prosecution, Whitehead testified to the following:

*233 Q: Mr. Whitehead, isn't that one of the things you said, that if you do have gunshot residue on your hands, if you handle a weapon you can get gunshot residue on your hands?
A: Yes, ma'am. If [Evans] had handled a weapon in the four-hour timeframe, most likely I would have identified residue on the palms of the hands, at the very minimum.
Q: So if he had handled a weapon within four hours of his death, you would have . . . expected to find gunshot residue?
A: Yes, ma'am.
Q: And did you find any gunshot residue on his hands?
A: No, ma'am, I did not.
(Emphasis added). Seemingly confused by Whitehead's testimony on redirect, which appears to contradict his testimony under cross-examination, defense counsel then stated, "Your Honor, I know recross is unusual, but I misunderstood." Defense counsel was then interrupted by the prosecutor, who stated, "Your Honor, if [defense counsel] wants to ask a question he needs to approach the bench. But his time is over." A bench conference then ensued, the content of which is not part of the record. Aside from defense counsel's statement, "I know recross is unusual, but I misunderstood," there is no evidence in the record that Bailey demanded the opportunity to examine Whitehead on recross, or that his request was denied by the trial court. Furthermore, if, during the bench conference, the trial court denied Bailey's request to re-examine Whitehead, no objection to that ruling appears in the record.
¶ 14. In its closing argument, the prosecution honed in on and reiterated Whitehead's last statement, that is, that if Evans had merely handled a gun during the four hours before his death, there would have been gunshot residue on his hands. The absence of such residue, the prosecution argued, necessarily disproved Bailey's version of events: if no residue was found on Evans's hands, that meant that he never so much as picked up a gun, and therefore that Bailey's self-defense story was a ruse. On appeal, Bailey argues that the prosecution deliberately mischaracterized Whitehead's testimony. He argues that Whitehead's testimony, taken in its entirety, stands for the proposition that, while gunshot residue would reasonably be expected to have been found on Evans's hands had he actually fired a weapon, no gunshot residue would be expected to have been found on Evans's hands had he merely handled a weapon. Thus, Bailey argues, the prosecution deliberately mischaracterized Whitehead's testimony by arguing that the lack of gunshot residue on Evans's hands led to the conclusion that he did not even pick up a gun within the four hours preceding his death.
¶ 15. Complicating matters is the State's admission at oral argument that Whitehead's testimony meant exactly what Bailey asserts, namely, that while one could expect to find gunshot residue on the hands of the deceased had he fired a gun within the four hours preceding his death, the absence of such residue on Evans's hands does not mean that he never so much as picked up a gun within the four hours preceding his death. Regardless, it is not this Court's task to determine which version of Whitehead's testimony is accurate. Bailey did not object to the denial of his opportunity to re-examine Whitehead to clear up this matter, and thus waived his right to argue that Whitehead did not mean what he said when he answered, in the affirmative, the prosecutor's question, "So if [Evans] had handled a weapon within four hours of his death, you would have expected to find gunshot residue?" (Emphasis *234 added). Furthermore, considering the strength of the other evidence against Bailey, we find that, even had the statement been a misrepresentation of Whitehead's testimony, the prejudice caused by the statement would have been minimal. We find this issue to be without merit.
D. Whether the prosecution's comments suggesting improper behavior on the part of defense counsel unfairly prejudiced Bailey.
¶ 16. Prior to calling Pickens to testify during its case-in-chief, the prosecution requested that the court allow it to treat him as a hostile witness. During a hearing outside the presence of the jury, the prosecution stated its belief that Pickens's trial testimony would differ from the statement he gave to the Jackson Police Department. In support of its position, the prosecution introduced Darlene Matthews, Pickens's grandmother, who testified that Pickens had told her that he was going to have to change his testimony. During the hearing, the prosecution argued that defense counsel had taken Pickens to the jailhouse to confer with Bailey on May 8, 2004, and that at this meeting, defense counsel exerted pressure on Pickens to change his story so as to support Bailey's version of events.
¶ 17. When Pickens took the stand, his testimony differed from the statement he had given to the Jackson Police Department; specifically, Pickens testified that the door to Evans's truck had been ajar at the time of the shooting, and that Evans and Bailey had "tussled" prior to the shooting, with Evans "g[etting] the best of" Bailey. On redirect examination by the prosecution, Pickens admitted that his memory of the events on the night of October 24, 2001, was refreshed after he read Bailey's statement, which was provided to him by defense counsel. In closing arguments, the prosecution reminded jurors of the meeting between Bailey and Pickens, stating:
The interesting thing[ ] that you need to remember, James Pickens gave his statement before Frank McWilliams, the defense attorney, pulled him out of his jail cell and put him in the same room as the defendant. Does that sound a little odd to you. It does to me.
And then if that's not bad enough  and this happened on Saturday, May 8th, two days before this trial was going to start. No question about that. Then on top of putting them in the same room with the guy that he hasn't said that the victim had a gun, and he already said in his statement that the door was closed two or three times, then he gives him the defendant's statement. Let's kind of read over my guy's statement because you know, it kind of needs to  I need you to, 
(Emphasis added). Defense counsel objected at this point, and the objection was sustained by the trial court. The trial judge further instructed the jury to disregard the prosecution's last statement.
¶ 18. Bailey asserts that the prosecution's statements implicitly, if not explicitly, accused defense counsel of subornation of perjury, and that Bailey was deprived of his right to a fair trial as a result. We agree that the prosecution's final statement was a naked attempt to appeal to the prejudices of the jury, and thus highly inappropriate. Defense counsel owed a duty to Bailey to prepare Pickens and other witnesses for trial, and in its argument the prosecution cast aspersions on defense counsel for fulfilling those duties. However, we cannot find reversible error in this case for two reasons. First, the Mississippi Supreme Court has repeatedly held that where the trial court instructs the jury to disregard such a *235 statement, it is presumed that jurors follow the instruction of the trial court so as to dissipate any prejudice to the defendant. See, e.g., Crenshaw v. State, 520 So.2d 131, 134 (Miss.1988). In this case, the trial court instructed the jury to disregard the inflammatory statement, dispelling any prejudice to Bailey. Secondly, we find that, even had the trial court not instructed the jury to disregard the improper argument, the effect of the argument would not have been sufficiently prejudicial as to merit a new trial. The evidence favoring Bailey's guilt was substantial, and we cannot say that this comment alone was sufficient to influence the jury's verdict. This issue is without merit.
II. WHETHER THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY ON THE STATE'S BURDEN OF PROOF.
¶ 19. Bailey claims that the trial court erred by failing to instruct the jury that the State bore the burden of proving, beyond a reasonable doubt, that Bailey did not act in necessary self-defense in shooting Evans. A review of the record shows this contention to be meritless.
¶ 20. Defense counsel submitted jury instruction D-9, which correctly set forth the law regarding self-defense. However, the court redacted from instruction D-9 the statement that "[t]he burden is on the State to prove beyond a reasonable doubt that Deric Bailey did not act in self-defense when he killed Thomas Evans on October 24, 2001." Bailey claims that the removal of this portion of instruction D-9 resulted in the jury being improperly informed that he carried the burden of proving that he acted in self-defense in shooting Evans.
¶ 21. "In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." Johnson v. State, 823 So.2d 582, 584(¶ 4) (Miss. Ct.App.2002) (quoting Hickombottom v. State, 409 So.2d 1337, 1339 (Miss.1982)). Defendants do not have an absolute right to have their jury instructions granted. "A defendant is entitled to have jury instructions given which present his theory of the case. However[,] the trial judge may also properly refuse instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case." Rushing v. State, 911 So.2d 526, 537(¶ 24) (Miss.2005).
¶ 22. In the present case, instruction S-1 informed the jurors that in order to convict Bailey of murder, they had to find, beyond a reasonable doubt, that Bailey killed Evans wilfully, unlawfully, feloniously, without authority of law, with deliberate design to effect Evans's death, and not in necessary self-defense. Instruction S-1 further stated, "Should the State fail to prove any of these elements, then you must find the defendant not guilty." (Emphasis added). These instructions sufficiently informed the jury that the State bore the burden of proving beyond a reasonable doubt that Bailey did not act in necessary self-defense in killing Evans. Accordingly, the trial court did not err in amending instruction D-9, as the redacted portion was repetitive and unnecessary. This issue is without merit.
III. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING THE PROSECUTION TO EXAMINE JAMES PICKENS AS AN ADVERSE WITNESS, AND WHETHER THE TRIAL COURT ERRED IN ALLOWING PICKENS'S PRIOR INCONSISTENT STATEMENT *236 TO BE CONSIDERED BY THE JURY AS SUBSTANTIVE EVIDENCE.
¶ 23. As discussed supra, in anticipation that James Pickens's trial testimony would differ from the statement he made to the Jackson Police Department, the prosecution requested to treat Pickens as a hostile witness and thus to ask him leading questions. The trial court granted the request when, under direct examination by the State, Pickens claimed that Evans's door had been "ajar" at the time of the shooting. This statement was in direct conflict with Pickens's prior, audiotaped statement to the Jackson Police Department in which he told investigators that Evans "got his door closed" prior to being shot by Bailey. In response to Pickens's testimony, the prosecution was allowed to introduce into evidence and play before the jury the tape of Pickens's statement. Bailey contends that the trial court erred by allowing the prosecution to treat Pickens as an adverse witness. Additionally, he claims that the trial court erred in allowing this prior inconsistent statement to be considered by the jury as substantive evidence.
A. Whether the trial court erred in granting the prosecution's request to treat Pickens as an adverse witness.
¶ 24. M.R.E. 611(c) states that while leading questions should ordinarily be allowed only on cross-examination, leading questions on direct examination are appropriate when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party. The decision to allow leading questions is one that rests within the discretion of the trial court, and we will reverse such a decision only upon a showing of abuse of discretion. Hughes v. State, 735 So.2d 238, 278 (¶ 191) (Miss.1999).
¶ 25. In the present case, Pickens's statement to the police supported the prosecution's theory that Bailey did not act in self-defense in shooting Evans: in order for Bailey to have been able to pick up the gun Evans allegedly pointed at him, the gun would have to have fallen out of the truck's cabin and through the open door. However, Pickens's trial testimony that the door to the truck had in fact been ajar undermined the prosecution's theory and supported Bailey's version of events. In the instant case, the trial court judge did not abuse his discretion in allowing the prosecution to treat Pickens as an adverse witness.
B. Whether the trial court erred in allowing Pickens's prior inconsistent statement to be considered by the jury as substantive evidence.
¶ 26. Upon eliciting from Pickens that the door to Evans's truck had been "ajar" at the time of the shooting, the prosecution sought to impeach Pickens with his statement to the Jackson Police Department in which he claimed that Evans's door had actually been closed. The prosecution proceeded to play an audiotape of Pickens's entire statement to the police, and afterward grilled Pickens on the statements contained in the tape. The prosecution repeatedly asked Pickens if he had in fact made the statements on the tape, and in every case, Pickens admitted that he had. The audiotape was allowed into evidence over defense counsel's objection, and ultimately made its way to the jury room during deliberations.
¶ 27. It is well-settled that, where a non-party witness admits to having made a prior inconsistent statement, the statement should not be received into evidence for any purpose. See, e.g., Conner v. State, 632 So.2d 1239, 1260 (Miss. 1993), overruled on other grounds by *237 Weatherspoon v. State, 732 So.2d 158 (Miss.1999); Moffett v. State, 456 So.2d 714, 719 (Miss.1984); Jones v. State, 856 So.2d 389, 393-94(¶ 8) (Miss.Ct.App.2003) (noting that when witness admits prior inconsistent statement, extrinsic evidence of the statement is superfluous). Allowing such a statement into evidence, even if only for impeachment purposes, creates a risk of confusing the jury: "The average juror will have a difficult enough time without the statement sitting in his lap keeping distinct in his mind that which he has heard as evidence and what he has been told may be considered for impeachment only." Moffett, 456 So.2d at 719 (quoting McCormick, Evidence § 38, at 75-76 (2d ed.1972)). Furthermore, it is hornbook law that an unsworn prior inconsistent statement may never be used as substantive evidence. Morgan v. State, 818 So.2d 1163, 1171(¶ 16) (Miss.2002) (quoting Parker v. State, 691 So.2d 409, 413 (Miss.1997)). In the present case, the trial court first erred in allowing Pickens's prior inconsistent statement and audiotape to be admitted as evidence, and further erred by allowing the jury to consider Pickens's statement as substantive evidence.
¶ 28. It is clear from the record that Pickens fully acknowledged making a prior inconsistent statement to the Jackson Police Department. Several times while under direct examination by the State, Pickens admitted that he made the statements contained in the audiotape. Most relevant for the purposes of this discussion is the following exchange, from the prosecution's direct examination of Pickens:
Q: Well, let me ask you this. You heard the part of the tape recorder [sic] that you said [Evans] tried to slam  almost slammed [Bailey's] hand in the door; correct?
A: Correct.
. . . .
Q: Okay. You said [Evans] almost slammed [Bailey's] hand in the door like that. Isn't that what you said?
A: Correct.
Q: Didn't you hear yourself say it?
A: Correct.
. . . .
Q: And was [Evans's] driver door closed. . . . But you know what I'm saying, like [Evans] was trying to close the door, and Deric was trying to open the door or something. And you know, Deric, just, you know, [Evans] got his door closed. . . . Didn't you hear yourself say that?
A: Yeah.
¶ 29. It is clear from the record that Pickens fully admitted making a prior inconsistent statement to the police, and the preceding passage illustrates Pickens's acknowledgment that his trial testimony conflicted with his prior statement. When Pickens admitted making the prior inconsistent statement, the impeachment was complete, and it was error for the trial court to admit into evidence extrinsic evidence (i.e., the audiotape) of the prior statement. See Conner, 632 So.2d at 1260.
¶ 30. Though Pickens's prior inconsistent statement could have been before the jury for its impeachment value, the jury most assuredly should not have been allowed to consider Pickens's audiotaped statement as substantive evidence. As the Mississippi Supreme Court has held, "[C]ounsel may not use prior inconsistent statements as a `guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not otherwise admissible.'" Flowers v. State, 773 So.2d 309, 326(¶ 58) (Miss.2000) (quoting Harrison v. State, 534 So.2d 175, 178 (Miss.1988)). Had Pickens made his statement to the police while under oath and *238 subject to cross-examination, the statement would not be considered hearsay at all, and could have been rightfully admitted as substantive evidence. See M.R.E. 801(d)(1)(A). However, as Pickens's statement did not meet the criteria of Rule 801(d)(1)(A), and did not fall within an exception to the general prohibition against hearsay, it should not have been admitted into evidence for substantive purposes.
¶ 31. It is evident from the record that the prosecution had every intent of using Pickens's prior inconsistent statement as substantive evidence, and not for purposes of impeachment. For example, after discussing the "critical" nature of the matter contained in Pickens's prior statement, the prosecution played that statement in its entirety before the jury. Furthermore, the prosecution admitted, in response to defense counsel's objection to the admission of Pickens's prior statement, that the statement "wasn't even used to impeach [Pickens]." Lastly, and most illuminating, was the prosecution's closing argument, in which time and again the State emphasized the substantive value of Pickens's prior statement:
In [Pickens's] statement, and you will read it, he said time and time again, I ain't going to lie. [Evans] didn't have no gun. That's what he said. No gun.
. . . .
Now, first, [Pickens's] first statement  and go listen to the tape. First he says the victim did not have a gun. In fact, he said he almost slammed the door on Deric's hand. The door was closed.

. . . .
James Pickens sat up here and finally admitted, he said, I said what I said. I said what I said. So what's on that tape, it's true. I said what I said.
(Emphasis added). The dissent disagrees with our conclusion that the primary purpose for the impeachment of Pickens was to place his prior inconsistent statement before the jury as substantive evidence. However, the prosecution admitted its motive during the hearing, stating, "[We] can't play the tape unless [Pickens] is deemed a hostile witness. We can't play a tape." The prosecution's statement makes it clear that it was of paramount importance that the tape be played before the jury.
¶ 32. It is overwhelmingly clear from the above that Pickens's statement was introduced for no other purpose than to serve as substantive evidence; accordingly, the trial court erred in allowing Pickens's statement to be considered as such by the jury. Though the evidence of Bailey's guilt in this case was strong, we, unlike the dissent, cannot find that the trial court's error in this instance was harmless. The issue of whether Evans's door had been open at the time of the shooting was of paramount importance to Bailey's case, and the trial court's ruling deprived Bailey of the right to present his defense effectively. While Parker v. State, 691 So.2d 409 (Miss.1997), suggests that a limiting instruction given by the trial court might have cured the error in the present case, the trial court gave no such instruction. In the words of the Mississippi Supreme Court, admitting this type of evidence "is a bad practice and when this Court sees it, we are required to reverse. Such a blatant violation of our rules of evidence constitutes reversible error." Parker, 691 So.2d at 414. Accordingly, we must reverse and remand for a new trial.
IV. WHETHER THE TRIAL COURT ERRED IN DENYING BAILEY RECROSS-EXAMINATION OF SERGEANT ALLEN WHITE.
*239 ¶ 33. As part of its case-in-chief, the prosecution called Sergeant Allen White to the stand. Under direct examination, White testified that he had participated in the interviews of both Bailey and of Fred Braddock. White further testified that Braddock claimed that Bailey had confessed the killing to him, and that Braddock had picked Bailey out of a photo line-up. On cross-examination, defense counsel asked White if he was "trying to hide something," after eliciting from White that certain facts given by Braddock in his taped interview were not included in Braddock's written statement. Lastly, defense counsel questioned White about the content of Bailey's statement.
¶ 34. On redirect examination, the prosecution introduced into evidence, over objection, Bailey's written statement. The prosecutor proceeded to ask White whether he was biased against Bailey, and, whether during the course of his investigation, he had attempted "to hide something." Finally, the prosecution asked White about the usual procedures he followed when taking statements from suspected criminals, and asked specific questions about the procedures used in taking the statement of Fred Braddock. At the close of redirect examination, the trial court denied Bailey's request for recross-examination of White. Defense counsel objected, arguing that the prosecution, during redirect examination, went into matters not asked on cross-examination, and that the denial of recross-examination violated Bailey's confrontation rights.
¶ 35. The Mississippi Constitution grants and guarantees to an accused in a criminal prosecution the right to confront witnesses against him. Miss. Const. art. 3, § 26. The constitutional right of confrontation of witnesses encompasses the right to cross-examine them. Hubbard v. State, 437 So.2d 430, 434 (Miss. 1983). However, "recross-examination is not allowable as a matter of right, but a matter of trial court discretion." Howell v. State, 860 So.2d 704, 737 (¶ 115) (Miss. 2003). Furthermore, the Mississippi Supreme Court has held that a trial court's denial of re-cross examination is proper "where there is no claim of oversight and no reason stated why the matter was not inquired into on cross examination." Wells v. State, 849 So.2d 1231, 1238(¶ 22) (Miss.2003).
¶ 36. Bailey claims that he was entitled to recross-examination because the prosecution's questioning on redirect went beyond matters raised during cross-examination. On cross-examination, defense counsel asked White if he was "trying to hide something"; thus, the prosecution's line of questioning regarding White's possible bias and of the procedures he used in taking statements from both Bailey and Braddock did not elicit new material. Furthermore, on cross-examination of White, defense counsel specifically referred to excerpts from Bailey's written statement. Thus, the contents of Bailey's statement were fair game for redirect examination.
¶ 37. A review of the record reveals that Bailey was allowed full cross-examination of White. We will not impute to the trial court Bailey's failure to cross-examine White fully on White's possible bias, the procedures followed in taking the statements of Bailey and Braddock, or the contents of Bailey's statement. See id. at 1238-39(¶ 22). We find that Bailey did not take full advantage of his opportunity to cross-examine White, and that the trial court did not abuse its discretion in denying Bailey's request for recross-examination. This issue is without merit.
*240 V. WHETHER THE TRIAL COURT ERRED IN EXCLUDING THE STATEMENT OF JUSTIN DARBY.
¶ 38. Bailey claims that the trial court erred when it denied him the opportunity to introduce the statement of Justin Darby. Darby was originally charged with the murder of Evans, but was exonerated when police determined that the informant who led them to Darby had lied. When Bailey attempted to introduce Darby's statement during cross-examination of Detective Terry Dismuke, the State objected, claiming that the statement was irrelevant. It appears from the record that the trial court sustained the objection during a bench conference.
¶ 39. On appeal, Bailey claims that Darby's statement and the manner in which it was taken were relevant to show that the officers who took Bailey's statement treated Bailey differently from other suspects, thus calling the officers' credibility into doubt. However, at trial, Bailey failed to make an offer of proof showing the possible relevance of Darby's statement. As Bailey's failed to make such a proffer, he may not now complain about the exclusion of the statement. See Moore v. Moore, 757 So.2d 1043, 1046(¶ 13) (Miss.Ct.App. 2000) (citing Morreale v. Morreale, 646 So.2d 1264, 1270 (Miss.1994)). Thus, this issue is without merit.
VI. WHETHER THE TRIAL COURT ERRED IN SUSTAINING CERTAIN MOTIONS IN LIMINE.
¶ 40. The trial court granted the prosecution's motions in limine to prevent the introduction into evidence of (a) a statement that Evans "must have been buying drugs" at the Short Stop Grocery, made by Evans's father upon being informed that his son had been killed, and (b) a package of rolling papers found in Evans's truck after the shooting. In sustaining the State's motion as to Evans's father's statement, the trial court found that the statement was "rank speculation," irrelevant, and, further, more prejudicial than probative. As to the rolling papers, the trial court found that the relevance of the rolling papers was a "very close question," but found that the danger of unfair prejudice to Evans justified their exclusion. Bailey claims that the trial court, in suppressing these pieces of evidence, denied him the opportunity to present the "complete story" of what happened on the evening of October 24, 2001, thus prejudicing his defense.
¶ 41. "`Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. Furthermore, "[t]he standard of review for the admission of or refusal to admit evidence is well-settled: admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." Peters v. State, 920 So.2d 1050, 1055(¶ 12) (Miss.Ct. App.2006) (citing Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc., 716 So.2d 200, 210(¶ 36) (Miss. 1998)). Relevant evidence may be excluded if potential prejudice to a party substantially outweighs the probative value of the evidence. Mississippi Power & Light Co. v. Lumpkin, 725 So.2d 721, 732(¶ 55) (Miss.1998).
¶ 42. This Court cannot find that the trial court abused its discretion in suppressing the evidence in question. As the trial court found, there was no indication that Evans's father had any personal knowledge that Evans visited the Short Stop Grocery to purchase drugs. Furthermore, as the trial court found, even if the evidence of the statement was in fact relevant, it certainly was more prejudicial than *241 probative. As to the rolling papers, the trial court acted well within its discretion in excluding the evidence as being more prejudicial than probative. The trial court expressed its concern that the question of whether Evans was a marijuana user could confuse the jury and possibly lead it to condemn Evans were it to find that he had in fact used marijuana in the past. We find that the trial court made a reasoned decision to exclude the evidence in question here, and therefore find this issue to be without merit.
VII. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE FOURTEEN AUTOPSY PHOTOS OF THE DECEASED.
¶ 43. As part of the State's case-in-chief, the prosecution attempted to introduce eighteen photographs of the deceased, taken during an autopsy of the body. In a hearing outside of the presence of the jury, the prosecution argued that the photos served to contradict Bailey's theory that there had been a physical altercation between Evans and Bailey prior to the shooting. The State asserted that the photographs showed an absence of bruising and other injuries that would be expected to appear had Bailey and Evans actually gotten into a scuffle. Bailey objected to the introduction of some of the photographs, claiming that they were gruesome and more prejudicial than probative. After the prosecution withdrew four of the photographs, the trial court overruled Bailey's objection as to the remaining fourteen photos and allowed them into evidence.
¶ 44. "[T]he admissibility of photographs generally lies within the sound discretion of the trial court; and, absent an abuse of discretion, the court's decision will be upheld on appeal." Jones v. State, 920 So.2d 465, 476(¶ 35) (Miss.2006). A trial judge's discretion in this area "runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." Id. "Some probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence." Id. at 476-77(¶ 35).
¶ 45. In the present case, the photographs clearly had some probative value, i.e., to prove the absence of injuries indicating that Bailey and Evans had engaged in some type of physical confrontation prior to the shooting. The trial court acted well within its broad discretion in allowing the autopsy photographs into evidence. This issue is without merit.
¶ 46. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED AND REMANDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE, P.J., SOUTHWICK, IRVING, ISHEE AND ROBERTS, JJ., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY MYERS, P.J., AND GRIFFIS, J.
CHANDLER, J., Dissenting.
¶ 47. I respectfully dissent from the majority's decision to reverse and remand this case for a new trial. While I believe that the trial court erroneously admitted the tape recording of the prior inconsistent statement that James Bernard Pickens made to the police, I would find that the error was harmless. Therefore, I would affirm Bailey's conviction and sentence.
¶ 48. This Court reviews the rulings of the trial court admitting or excluding evidence for abuse of discretion. Ladnier v. State, 878 So.2d 926, 933(¶ 27) (Miss.2004). An error in the admission or exclusion of evidence is not grounds for reversal unless *242 the error affected a substantial right of a party. Id.; M.R.E. 103(a). The majority finds that the trial court's evidentiary rulings were erroneous for two reasons: (1) Pickens admitted to having made the prior inconsistent statements, and (2) the primary purpose of the impeachment was to place before the jury substantive evidence which was not otherwise admissible. I address both reasons below, beginning with the propriety of Pickens's impeachment with prior inconsistent statements.
I. Whether the impeachment of Pickens by prior inconsistent statements was proper.
¶ 49. Mississippi Rule of Evidence 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." Under Rule 613(a), a witness may be impeached by reading a prior inconsistent statement to the witness and asking the witness whether the statement accurately reflects what was said on the prior occasion. Johnson v. State, 905 So.2d 1209, 1212(¶ 20) (Miss. 2005) (quoting Everett v. State, 835 So.2d 118, 120-21(¶ 7) (Miss.Ct.App.2003)). A witness may be impeached with a prior inconsistent statement if a proper predicate is laid and as long as the statement made in court is relevant and not collateral. Carlisle v. State, 348 So.2d 765, 766 (Miss.1977). However, a party may never use his witness's prior statement in the "guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not otherwise admissible" in order to avoid the hearsay rule. Flowers v. State, 773 So.2d 309, 326(¶ 58) (Miss.2000).
¶ 50. There is no claim that Pickens's in-court statements were collateral or irrelevant. The record reveals that a proper predicate was laid for impeachment of Pickens with prior inconsistent statements. The majority concludes that the primary purpose of the prosecution's impeachment of Pickens was to place his prior inconsistent statements before the jury as substantive evidence. Having considered the record in its entirety, I disagree. The majority of Pickens's trial testimony was actually favorable to the prosecution and not especially supportive of Bailey's claim of self-defense. Pickens testified that he and Bailey went to the Short Stop Grocery store together and that he, Pickens, went inside the store. When Pickens came out, Bailey and Evans were talking beside Evans's truck. Then, they began arguing and Evans retreated to his truck. Pickens was about ten feet away from the truck. He saw Evans get into the driver's seat and begin to close the driver's side door. Bailey tried to pull the door open and Evans tried to pull it closed. According to Pickens's testimony, the door never closed all the way, but remained "ajar." Pickens further testified that Evans said, "f___ you, n____s," and leaned over toward the passenger side of the truck. Then, Bailey pulled his gun and fired a shot into the truck. Pickens testified that he never saw Evans with a gun and never saw Bailey pick anything up off the ground.
¶ 51. Pickens's testimony primarily differed from his prior statement to the police in two ways. Firstly, Pickens told the police that, before Bailey shot Evans, the truck's driver's side door was closed. The prosecutor vigorously questioned Pickens about the discrepancy between this prior statement and Pickens's trial testimony that the door was ajar. Secondly, Pickens did not tell the police that Evans had leaned toward the passenger side before Bailey shot him. Pickens admitted having made these statements to the police. He explained that the statements differed from his trial testimony because he was nervous when speaking to the police and because the police had not allowed him to finish his story.
*243 ¶ 52. In my opinion, there is no indication that the prosecution sought to impeach Pickens with his prior inconsistent statements for the primary purpose of having the jury consider the statements substantively. Rather, the record indicates that the prosecution used the statements to cast doubt on the credibility of certain aspects of Pickens's trial testimony, namely, those aspects of Pickens's story that he had changed since his statement to the police. The prosecution also elicited testimony from Pickens that he had announced he was changing his testimony after his pre-trial meeting with defense counsel and Bailey. At this meeting, Pickens read Bailey's typed statement. From this information, the jury could infer that portions of Pickens's trial testimony were incredible because his visit with defense counsel and Bailey had induced him to alter some of his testimony to favor Bailey.
¶ 53. The record indicates that the majority of Pickens's trial testimony favored the prosecution. The prosecution attacked the credibility of certain unfavorable portions of Pickens's testimony with his prior inconsistent statements. I would find that this was proper impeachment with prior inconsistent statements, not a ploy to have the inconsistent statements considered as substantive evidence. Moreover, as discussed below, I believe that even if the impeachment of Pickens with his prior inconsistent statements was error, the error was harmless.
II. Whether the admission of the tape of Pickens's statement to police was proper.
¶ 54. The trial court admitted Pickens's tape-recorded statement to the police into evidence. The majority finds that the trial court erred by admitting the tape because Pickens admitted that he made the prior inconsistent statements. I agree with this holding. Mississippi Rule of Evidence 613(b) states that extrinsic evidence of a witness's prior inconsistent statement is admissible if the witness "is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require." Our supreme court has held that, "when a witness fails in any manner to acknowledge the making of a statement, the impeacher is obligated to offer proof establishing the making of that statement, assuming, of course, that the issue is relevant." Harrison v. State, 534 So.2d 175, 180 (Miss.1988). However, if the witness admits having made the prior inconsistent statement, the witness has been impeached and extrinsic evidence of the statement is not admissible. Brown v. State, 682 So.2d 340, 345 (Miss.1996). Pickens admitted to having made the prior inconsistent statements. Therefore, no further proof of the statements was necessary for impeachment purposes and the trial court erred by admitting the tape recording.[3]
¶ 55. The majority finds that Bailey was denied a fair trial due to the erroneous admission of Pickens's unsworn prior statement that the door of Evans's truck was closed when Bailey shot Evans. The majority finds that this statement prejudiced Bailey's defense of self-defense. Due to the overwhelming weight of the evidence against Bailey, I would find that the error in admitting the tape recording *244 was harmless and does not require reversal. "An error is harmless when it is apparent on the face of the record that a fair-minded jury could have arrived at no verdict other than that of guilty." McKee v. State, 791 So.2d 804, 810(¶ 24) (Miss. 2001). "Where the prejudice from an erroneous admission of evidence dims in comparison to other overwhelming evidence, this Court has refused to reverse." Carter v. State, 722 So.2d 1258, 1262(¶ 14) (Miss.1998).
¶ 56. Bailey confessed that he shot Evans; the only issue at trial was whether the killing was murder, manslaughter, or self-defense. As explained by the majority, the issue of whether the truck's door was opened or closed at the time of the shooting was material to Bailey's defense of self-defense. This defense was raised by Bailey's statement to the police. In that statement, Bailey said that Evans displayed a gun, prompting Bailey to shoot him out of fear for his own life. Bailey said that, when he shot Evans, Evans dropped the gun and it landed on the ground near the truck. Bailey said he picked up the gun and later sold it. Bailey contends that Pickens's statement that the truck's door was closed when he shot Evans was damaging to his self-defense claim because, if the door was closed, no gun could have fallen out of the truck when Evans was shot.
¶ 57. In my opinion, there was overwhelming evidence negating Bailey's claim of self-defense without Pickens's statement that the door was closed. Billy Donerson testified that he was working across the street from the Short Stop grocery store at the time of the shooting and that, when he heard the shot, he immediately looked at what was going on at the grocery store. He saw the truck backing up with the driver's side door closed and the window up. Donerson saw the truck back into a dumpster and then he saw Evans slump over. Donerson saw Bailey and Pickens run away. He did not see one of them pick something up from the ground. Donerson watched the truck until Officer Crawford arrived and did not see anyone open the doors or windows. Officer Crawford testified that, when he arrived, Evans was unconscious inside the truck with both doors locked and the windows up. No gun was found inside the truck. And, though Pickens testified that the truck's door was ajar, Pickens did not see Evans with a gun or see Bailey pick something up from the ground.
¶ 58. Further, during the testimony of Detective Dismuke, the prosecution drew attention to several inconsistencies in Bailey's statement. Particularly, Bailey stated that the gun was in Evans's right hand when he shot Evans but also stated that, after Evans was shot, the gun dropped from Evans's left hand onto the ground. Bailey further stated that, when he picked up the gun and fled the scene, Evans's left arm was hanging out of the truck door. This contention was refuted by all of the other testimony concerning the position of Evans's body after the shooting. Finally, the testimony established that, though Bailey had bragged to several people that he killed Evans, he never told anyone that Evans had a gun until his statement to the police seven months after the shooting occurred.
¶ 59. In light of the overwhelming evidence of Bailey's guilt of murder, I would find that the error in admitting Pickens's tape recorded statement to the police was harmless. I would affirm Bailey's conviction and sentence.
MYERS, P.J., AND GRIFFIS, J., JOIN THIS OPINION.
NOTES
[1] Pickens's trial testimony, in some respects, was in conflict with the statement he made to the police. In particular, Pickens testified at trial that the door to Evans's truck had in fact been ajar. This matter will be discussed further infra.
[2] As Whitehead's conclusion is a major issue in the present case, we will also address this matter in more detail infra.
[3] The majority notes that this error might have been cured by a limiting instruction to the effect that the jury could only consider Pickens's prior statements for their impeachment value and not for their truth. While I agree that a limiting instruction might have mitigated the error, I observe that Bailey never requested such an instruction.